Volume 1 of 2

FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CORRELL L. THOMAS,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>C. DILLARD, Police Officer,<br>*Defendant-Appellant*,<br><br>and<br><br>PALOMAR COMMUNITY COLLEGE DISTRICT,<br>*Defendant*. | No. 13-55889<br><br>D.C. No.<br>3:11-cv-02151-CAB-NLS<br><br><br>OPINION |

Appeal from the United States District Court
for the Southern District of California
Cathy Ann Bencivengo, District Judge, Presiding

Argued and Submitted
June 2, 2015—Pasadena, California

Filed April 5, 2016

Before: Ferdinand F. Fernandez, Raymond C. Fisher
and Carlos T. Bea, Circuit Judges.

Opinion by Judge Fisher;
Partial Concurrence and Partial Dissent by Judge Bea

# SUMMARY[*]

### Civil Rights

The panel reversed the district court's order on summary judgment denying qualified immunity to Palomar College police officer Christopher Dillard and also reversed the district court's partial summary judgment in favor of plaintiff on the issue of liability in an action brought pursuant to 42 U.S.C. § 1983 alleging unlawful seizure and excessive force under the Fourth Amendment.

Responding to a possible domestic violence call, officer Dillard demanded that plaintiff submit to a *Terry* frisk for a search of weapons. When plaintiff refused to be searched, officer Dillard tased him.

The panel held that although the domestic violence nature of a police investigation is a relevant consideration in assessing whether there is reason to believe a suspect is armed and dangerous, it is not alone sufficient to establish reasonable suspicion. The panel therefore held that Dillard violated plaintiff's Fourth Amendment rights against unreasonable seizure by detaining him for the purpose of performing a *Terry* frisk. The panel nonetheless held that Dillard was entitled to qualified immunity because it was not clearly established at the time that the initial demand for a frisk was unlawful. The panel further held that it was not clearly established at the time that continuing to detain a noncompliant domestic violence suspect for the purpose of

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

executing a frisk and tasing him when he refused to comply were unlawful.

Concurring in part and dissenting in part, Judge Bea agreed that Officer Dillard was entitled to qualified immunity on plaintiff's claims for unlawful seizure and excessive force under 42 U.S.C. § 1983, and that the district court's grant of partial summary judgment to plaintiff must accordingly be reversed. Judge Bea would hold, however, that the domestic violence nature of a call requesting police assistance *can* alone give rise to reasonable suspicion necessary to justify a *Terry* frisk.

## COUNSEL

Randall L. Winet, Winet Patrick Gayer Creighton & Hanes, Vista, California, for Defendant-Appellant.

Eugene G. Iredale (argued), Iredale and Yoo, San Diego, California; Mervyn S. Lazarus, Law Offices of Mervyn S. Lazarus, Newport Beach, California, for Plaintiff-Appellee.

## OPINION

FISHER, Circuit Judge:

Palomar College Police Officer Christopher Dillard responded to a call to investigate a man pushing a woman in a public area on the college's campus. There he found Correll Thomas, a student at the college who had been hanging out with and kissing his girlfriend, Amy Husky. Although Thomas was unarmed and in fact had committed no

act of domestic violence, Dillard demanded Thomas submit to a search for weapons, believing police officers are free to conduct a *Terry* frisk whenever they are investigating a potential "domestic violence" incident, regardless of the specific circumstances of the call or the facts encountered at the scene.[1]  When Thomas refused to be searched, Dillard tased him.  Thomas sued Dillard under 42 U.S.C. § 1983, asserting unlawful seizure and excessive force under the Fourth Amendment.  The district court denied Dillard qualified immunity on summary judgment and granted partial summary judgment to Thomas on the issue of liability. Dillard appeals.

We address whether a law enforcement officer has reasonable suspicion to conduct a *Terry* frisk, searching a suspect for weapons, based solely on the perceived domestic violence nature of the investigation.  We hold that, although the domestic violence nature of a police investigation is a relevant consideration in assessing whether there is reason to believe a suspect is armed and dangerous, it is not alone sufficient to establish reasonable suspicion.  We therefore hold Dillard violated Thomas' Fourth Amendment rights against unreasonable seizure by detaining him for the purpose of performing a *Terry* frisk.  Because it was not clearly established at the time that the perceived domestic violence nature of an investigation was insufficient to establish reasonable suspicion, however, we hold Dillard is entitled to

---

[1] Under the Fourth Amendment to the United States Constitution, frisking a person for weapons requires reasonable suspicion a suspect "is armed and presently dangerous to the officer or to others." *Terry v. Ohio*, 392 U.S. 1, 24 (1968).  To establish reasonable suspicion a suspect is armed and dangerous, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21.

qualified immunity. We further hold Dillard used excessive force when he tased Thomas in order to force him to submit to the *Terry* frisk against his consent. Given the frisk was unlawful and unnecessary, Dillard used unreasonable force. Nonetheless, given the unsettled state of the law regarding the use of Tasers at the time, we again hold Dillard is entitled to qualified immunity. Given the Supreme Court's instructions that we may not define clearly established law at too high a level of generality, it was not clearly established at the time of Dillard's actions that an officer who mistakenly but reasonably believed he had the right to conduct a *Terry* frisk could not deploy a Taser in dart mode to overcome a suspect's resistance to the frisk. Accordingly, without in any way endorsing Dillard's actions or overlooking the indignities those actions caused Thomas to suffer, we reverse the order of the district court and hold Dillard is entitled to summary judgment on the ground of qualified immunity.

## I. BACKGROUND

Because we are reviewing the denial of Dillard's motion for summary judgment based on qualified immunity, we assume Thomas' version of disputed facts and draw all reasonable inferences in his favor. *See Mattos v. Agarano*, 661 F.3d 433, 439 (9th Cir. 2011) (en banc).

At approximately 3:42 pm on September 21, 2010, the Palomar College Police Department dispatched Officer Dillard to the college's Escondido campus to respond to a domestic violence call involving a black male. Dillard spoke to a college administrator on the north side of campus, but was unable to obtain any further details pertaining to the domestic violence incident that may have prompted the call. The record contains virtually no information about this call.

We have no description of the suspect other than Dillard's belief that the call mentioned a black male, no description of the what the alleged "domestic violence" may have entailed and no information about where the incident might have occurred.

Approximately 40 minutes later, at 4:20 pm, while he was speaking with the administrator, Dillard received a call to investigate a male wearing a purple shirt pushing a female near some storage containers on the south side of the Escondido campus. A male wearing a purple shirt pushing a female was the entire scope of the call. There was no further description of the "suspect," or of the alleged "pushing," and the call made no mention of domestic violence. When Dillard arrived on the scene, he first encountered a community service officer who had also responded to the call, and who would remain present throughout the ensuing incident.[2] Dillard then saw a male with a purple shirt and a female come out from behind the storage containers.[3] These were Thomas, who is African-American, and his girlfriend, Husky.[4]

---

[2] The dissent describes the encounter as occurring in "an alley flanked by large storage containers." Dissent at 49. As the district court pointed out, however, there was nothing sinister about the location of the encounter: "The area to which Officer Dillard was dispatched, although described as an alley, was an open paved road bordered on one side by a large parking lot. It was not a restricted or suspicious area."

[3] The dissent includes additional details about Thomas' appearance that have no bearing on the issues presented in this case – e.g., that Thomas was wearing "skater shoes, a neck chain, an earring, and a black beanie." Dissent at 49.

[4] At the time of the encounter, Dillard and Thomas both stood about five and a half feet tall and weighed about 160 pounds.

Dillard got out of his police car, telling Thomas and Husky as he did so that no one was in trouble. Dillard stopped about 10 feet away from Thomas and Husky, who were standing next to each other. Dillard saw no indication that a crime had occurred. Husky exhibited no signs of domestic violence. She showed no signs of injury. She had not been crying. She did not appear distraught. The area was open to the public. Thomas and Husky looked like normal college students. Their hands appeared empty. They may have appeared startled or fidgety, but, as Dillard testified, these were normal behaviors.

Dillard asked Thomas and Husky whether they had identification. Thomas responded that he did; Husky said she did not. Dillard did not ask to see the identification. Instead, he asked Thomas whether he had any weapons on him. When Thomas responded that he did not, Dillard asked Thomas whether he would mind being searched for weapons. This was approximately 15 seconds into the encounter. Thomas responded that he did mind.

Dillard approached Thomas and asked again whether he would consent to a search for weapons. When Thomas declined, Dillard told Thomas he had received a call "about a guy in a purple shirt pushing around a girl." Thomas and Husky both denied they had seen anything or had done anything wrong. They both denied they were fighting, or that Thomas was pushing Husky. Husky told Dillard they had just been kissing behind the storage containers. Dillard asked Thomas again for consent to search for weapons, and Thomas again refused. Dillard moved toward Thomas, attempting to grab him and place him a controlled hold for the purpose of conducting a frisk. When Thomas stepped away to avoid being grabbed, Dillard backed off, pulled out his Taser,

pointed it at Thomas and told Thomas he was going to search him. This occurred approximately 30 to 40 seconds into the encounter. Husky, meanwhile, was yelling at Dillard that Thomas had done nothing wrong.

Thomas continued to respond to Dillard's questions but to withhold his consent to being searched. He was not aggressive or belligerent. Dillard called for backup and kept his Taser pointed at Thomas. Dillard told Thomas to put his hands in the air, step forward and drop to his knees. Thomas refused to do so. In response to the call for backup, a uniformed Escondido police officer arrived on the scene and pointed her handgun at Thomas from a distance of 15 feet away. When the Escondido officer told Thomas to put up his hands, he did so. Dillard told Thomas that if he did not get down on his knees by the count of three, Dillard would tase him. Dillard counted to three, and, when Thomas did not comply, tased Thomas. Dillard fired the Taser in dart mode, discharging a set of electrified barbs that lodged in Thomas' chest and delivered an incapacitating surge of electrical current to his body. This occurred approximately six minutes into the encounter. Thomas was handcuffed, searched (no weapons were found), treated by paramedics, arrested and charged with unlawfully resisting, delaying or obstructing a peace officer. *See* Cal. Penal Code § 148(a)(1). The charges were dismissed six months later.

Thomas filed suit against Dillard under 42 U.S.C. § 1983, alleging violations of his Fourth Amendment rights to be free from unlawful seizure and excessive force. He also alleged claims under California state law for negligence and violation of California Civil Code § 52.1. Dillard moved for summary judgment, and Thomas cross-moved for partial summary judgment on the issue of liability. The district court denied

Dillard's motion and granted Thomas' motion. The court ruled Dillard lacked reasonable suspicion to believe Thomas was armed and dangerous, and thus that Dillard unlawfully seized Thomas for the purpose of conducting a weapons search. The court also denied qualified immunity for this seizure, reasoning:

> Having determined the existence of a constitutional violation, the Court considers whether the right violated was clearly established at the time of its occurrence. At the time Officer Dillard tased Thomas to force his compliance with a weapons' search, it was clearly established that such a search is unreasonable unless supported by the officer's reasonable suspicion that the person to be searched is armed and dangerous. *Ramirez* [*v. City of Buena Park*], 560 F.3d [1012,] 1023 [(9th Cir. 2009)]. There was no objective evidence to support a reasonable suspicion that Thomas had a weapon. Officer Dillard's explanation, based on his subjective characterization that this was a domestic violence call and therefore necessitated a search without any indication a weapon was involved, is wholly inadequate to justify his conduct. It would have been clear to a reasonable officer that a search of Thomas in the circumstances presented was unlawful. Officer Dillard is not entitled to qualified immunity.

The court further ruled "Dillard's use of his taser to compel Thomas's compliance with the search was excessive force."

"Having concluded that Officer Dillard had no reasonable suspicion to support a search of Thomas for weapons, any force used to accomplish that search was objectively unreasonable and tasing Thomas was clearly excessive," the court wrote.  Dillard timely appealed.

## II.  JURISDICTION AND STANDARD OF REVIEW

Ordinarily, we lack jurisdiction over an appeal from a denial of summary judgment because it is not a "final" judgment under 28 U.S.C. § 1291.  *See Mueller v. Auker*, 576 F.3d 979, 987 (9th Cir. 2009).  A public official, however, may immediately appeal the denial of a motion for summary judgment asserting qualified immunity.  *See Mitchell v. Forsyth*, 472 U.S. 511, 526–27 (1985). Accordingly, we have jurisdiction to review the denial of qualified immunity to Dillard.  Our review is limited to whether, after construing disputed facts and reasonable inferences in favor of Thomas, Dillard is entitled to qualified immunity as a matter of law.  *See Mattos*, 661 F.3d at 439 & n.2.  We review this question de novo.  *See id.* at 439.[5]

## III.  DISCUSSION

Qualified immunity shields a police officer from suit under § 1983 unless (1) the officer violated a statutory or constitutional right, and (2) the right was clearly established

---

[5] Under the circumstances of this case, we also have jurisdiction to review the district court's grant of partial summary judgment to Thomas on the issue of Fourth Amendment liability because our holding that Dillard is entitled to qualified immunity necessarily resolves the issue of Dillard's liability.  *See K.W. ex rel. D.W. v. Armstrong*, 789 F.3d 962, 975 (9th Cir. 2015); *Bull v. City & Cty. of San Francisco*, 595 F.3d 964, 971, 982 (9th Cir. 2010) (en banc).

at the time of the challenged conduct. *See Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014); *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011). Although we have discretion in deciding which of these two prongs to address first, here we elect to follow the order laid out above. *See Mattos*, 661 F.3d at 440. We evaluate separately the constitutionality of each distinct Fourth Amendment intrusion: the investigatory stop, the *Terry* frisk and the use of the Taser. *See Ramirez*, 560 F.3d at 1019.

## A. Investigative Stop

The Fourth Amendment protects the "right of the people to be secure in their persons . . . against unreasonable searches and seizures" by the government. U.S. Const. amend. IV. "This inestimable right of personal security belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs." *Terry v. Ohio*, 392 U.S. 1, 8–9 (1968). "Unquestionably [Thomas] was entitled to the protection of the Fourth Amendment as he walked down the street in [Escondido]," just as John Terry was entitled to the same protection on a Cleveland street in 1963. *Id.* at 9.

*Terry* permits limited police intrusions on a person's freedom of movement and personal security when an officer's suspicion falls short of the "probable cause" required to execute an arrest or a "full" search. *See id.* at 20–27. To initiate a brief stop to investigate potential criminal activity, a stop that does not rise to the level of an arrest, an officer must have reasonable suspicion to believe "criminal activity may be afoot." *Id.* at 30; *United States v. Arvizu*, 534 U.S. 266, 273 (2002). This means the officer must have reasonable suspicion "the person apprehended is committing

or has committed a criminal offense." *Arizona v. Johnson*, 555 U.S. 323, 326 (2009).

Thomas does not challenge Dillard's initial decision to stop and question him and Husky for a brief period. Campus police dispatch had informed Dillard that a man wearing the same color shirt as Thomas had pushed a woman in the very location Thomas and Husky were found, by the storage containers. This created a reasonable suspicion Thomas might have committed a simple assault or battery, possibly in the context of a domestic relationship. *See, e.g.*, Cal. Penal Code § 242 (defining battery as "any willful and unlawful use of force or violence upon the person of another"); *id.* § 243(e)(1) (proscribing simple battery against "a person with whom the defendant has, or has had, a dating relationship").[6] Dillard was entitled to detain Thomas briefly to investigate the report of potential criminal activity – a so-called *Terry* stop.

In conducting the stop, Dillard also was permitted to ask Thomas for consent to search for weapons, *see United States v. Drayton*, 536 U.S. 194, 207 (2002), known as a *Terry* frisk, *see United States v. I.E.V.*, 705 F.3d 430, 433 (9th Cir. 2012). As the word "consent" implies, however, Thomas was free to decline Dillard's request. *See Florida v. Bostick*, 501 U.S. 429, 437 (1991) ("[A]n individual may decline an officer's request [for a consent search] without fearing prosecution."). The nature of the interaction between Dillard and Thomas changed significantly, however, once Dillard unholstered his

---

[6] Under California law, "the least touching may constitute battery." *People v. Myers*, 71 Cal. Rptr. 2d 518, 522 (Ct. App. 1998) (internal quotation marks omitted). It need not be violent or severe, and it need not cause bodily harm or even pain. *See id.*

Taser, pointed it at Thomas and *ordered* Thomas to submit to a frisk for weapons. At that point, he exceeded the justification and authority for the *Terry* stop – to investigate a potential battery. *See Florida v. Royer*, 460 U.S. 491, 500 (1983) ("The scope of the detention must be carefully tailored to its underlying justification."); *id.* ("[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."); *see also Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (noting the permissible duration of a traffic stop, "[l]ike a *Terry* stop," is determined by the "mission" of the stop). Once Dillard demanded Thomas submit to a search for weapons, he needed a reasonable basis for believing Thomas might be armed and dangerous in order to continue detaining him for the search. The question, then, is whether Dillard had such justification.

## B.  Frisk

Thomas argues Dillard had no justification for ordering him to submit to a *Terry* frisk and that detaining him to perform the frisk violated the Fourth Amendment. He contends it was clearly established that Dillard's conduct was unconstitutional when the events took place in September 2010, and Dillard therefore is not entitled to qualified immunity. We address these two prongs of the qualified immunity analysis in turn. We emphasize, again, that for this purpose we take the facts and inferences drawn from them in favor of Thomas.

### 1.  Constitutional Violation

Whereas the purpose of a *Terry* stop is to further the interests of crime prevention and detection, a *Terry* frisk is

justified by the concern for the safety of the officer and others in proximity. *See Terry*, 392 U.S. at 22–24. Accordingly, whereas a *Terry* stop is justified by reasonable suspicion that criminal activity may be afoot, a frisk of a person for weapons requires reasonable suspicion that a suspect "is armed and presently dangerous to the officer or to others." *Id.* at 24; *see also Johnson*, 555 U.S. at 326–27. "A lawful frisk does not always flow from a justified stop." *United States v. Thomas*, 863 F.2d 622, 628 (9th Cir. 1988). Rather, "[e]ach element, the stop and the frisk, must be analyzed separately; the reasonableness of each must be independently determined." *Id.*; *see also Terry*, 392 U.S. at 22–23.

A frisk for weapons "is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." *Terry*, 392 U.S. at 17; *see also id.* at 14–17 nn.11–14. As the Supreme Court recognized in fashioning the stop-and-frisk exception to probable cause, people have a strong interest in personal security, and routine police intrusions breed resentment within communities they serve. Accordingly, *Terry* was careful to craft a standard for a frisk that was both protective of law enforcement officers who confront potentially dangerous individuals and consistent with the objective, fact-based approach traditionally required to justify invasions into areas protected by the Fourth Amendment. *See id.* at 20–27.[7]

---

[7] The Court was particularly sensitive to resentment in minority communities with regard to aggressive stop-and-frisk tactics. *See Terry*, 392 U.S. at 14–15 & n.11 (citing President's Commission on Law Enforcement and Administration of Justice, Task Force Report: The Police 183–84 (1967)); *id.* at 16–17 & n.14; *see also* John Q. Barrett, *Deciding the Stop and Frisk Cases: A Look Inside the Supreme Court's Conference*, 72 St. John's L. Rev. 749, 770–72 (1998); Earl C. Dudley Jr., Terry v.

To establish reasonable suspicion a suspect is armed and dangerous, thereby justifying a frisk, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. A "mere 'inchoate and unparticularized suspicion or hunch'" that a person is armed and dangerous does not establish reasonable suspicion, *Maryland v. Buie*, 494 U.S. 325, 332 (1990) (quoting *Terry*, 392 U.S. at 27) (some internal quotation marks omitted), and circumstances suggesting only that a suspect would be dangerous *if* armed are insufficient, *see United States v. Flatter*, 456 F.3d 1154, 1157 (9th Cir. 2006). There must be adequate reason to believe the suspect *is* armed. *See id.*

Reasonable suspicion is an objective standard, asking whether "a reasonably prudent [person] would have been warranted in believing [the suspect] was armed and thus presented a threat to the officer's safety while he was investigating his suspicious behavior." *Terry*, 392 U.S. at 28. This inquiry requires consideration of all the facts and circumstances an officer confronts in the encounter; we consider the totality of the circumstances. *See id.*; *Navarette v. California*, 134 S. Ct. 1683, 1687 (2014); *Arvizu*, 534 U.S. at 273; *United States v. Sokolow*, 490 U.S. 1, 8 (1989); *United States v. Cortez*, 449 U.S. 411, 417 (1981); *United States v. Burkett*, 612 F.3d 1103, 1107 (9th Cir. 2010). Importantly, reasonable suspicion must be individualized: "[e]ven in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires reasonable, individualized

Ohio, *the Warren Court and the Fourth Amendment: A Law Clerk's Perspective*, 72 St. John's L. Rev. 891, 893 (1998).

suspicion before a frisk for weapons can be conducted." *Buie*, 494 U.S. at 334 n.2.

In assessing the totality of the circumstances, relevant considerations may include: observing a visible bulge in a person's clothing that could indicate the presence of a weapon, *see Flatter*, 456 F.3d at 1157 (citations omitted); seeing a weapon in an area the suspect controls, such as a car, *see Michigan v. Long*, 463 U.S. 1032, 1050 (1983); "sudden movements" suggesting a potential assault or "attempts to reach for an object that was not immediately visible," *Flatter*, 456 F.3d at 1157 (citing *United States v. Flippin*, 924 F.2d 163, 164–66 (9th Cir. 1991)); *cf. Ybarra v. Illinois*, 444 U.S. 85, 93 (1979) (holding reasonable suspicion was lacking where an individual's hands were empty and he made "no gestures or other actions indicative of an intent to commit an assault"); "evasive and deceptive responses" to an officer's questions about what an individual was up to, *Burkett*, 612 F.3d at 1107; unnatural hand postures that suggest an effort to conceal a firearm, *see id.* (suspect opened the passenger car door with his left hand and kept his right hand next to his body and appeared to reach for his coat pocket); and whether the officer observes anything during an encounter with the suspect that would dispel the officer's suspicions regarding the suspect's potential involvement in a crime or likelihood of being armed, *see Terry*, 392 U.S. at 28; *United States v. $109,179 in U.S. Currency*, 228 F.3d 1080, 1086 (9th Cir. 2000).

This last point is especially important. Even where certain facts might support reasonable suspicion a suspect is armed and dangerous when viewed initially or in isolation, a frisk is not justified when additional or subsequent facts dispel or negate the suspicion. Just as a suspicion must be

reasonable and individualized, it must be based on the *totality* of the circumstances known to the officer. Officers may not cherry pick facts to justify the serious Fourth Amendment intrusion a frisk imposes. *See Thomas*, 863 F.2d at 626–30 (holding there was reasonable suspicion to stop a driver who roughly resembled a counterfeiting suspect and was near the scene of the crime; but once the driver exited his vehicle and it was clear he did not match the suspect's description, there was no reasonable suspicion under the circumstances to justify further detention or a frisk).

Here, Dillard contends a reasonable officer would have been justified in believing Thomas was armed and dangerous based on the following specific facts: (1) Dillard had received two dispatches regarding potential violence against a female, Thomas loosely matched the minimal descriptions of the suspects in both dispatches, and Dillard encountered Thomas and Husky in the location where the pushing incident had been reported; (2) Thomas and Husky appeared startled and fidgety; (3) Thomas was wearing clothing – a T-shirt and loose-fitting jeans – capable of hiding a weapon; (4) Thomas refused to consent to a weapons search, even after Dillard explained the nature of his investigation; and (5) Thomas stepped away after Dillard approached him and attempted to place him into a controlled hold. Like the district court, we conclude these facts, viewed as part of the totality of the circumstances, did not give Dillard reason to believe Thomas was armed and dangerous.

*(1) Potential Domestic Violence Nature of the Call.* The only fact Dillard seriously presses for suspecting Thomas was armed at the time he demanded to frisk is the perceived domestic violence nature of the crime he was investigating. It is true, of course, that the type of crime a person is

suspected of committing may be highly relevant to the existence of reasonable suspicion for a weapons frisk. In *Terry*, the officer's suspicion that Terry was armed was premised largely on his substantiated suspicion that Terry was planning a daytime store robbery and that such robberies are "likely to involve the use of weapons." 392 U.S. at 28. Similarly, we have held it is reasonable for an officer to assume a suspected narcotics trafficker is likely armed. *See $109,179 in U.S. Currency*, 228 F.3d at 1086–87. The same is true for a suspected bank robber, *see United States v. Johnson*, 581 F.3d 994, 1000 (9th Cir. 2009), someone suspected of involvement in a large-scale marijuana growing operation, *see United States v. Davis*, 530 F.3d 1069, 1082–83 (9th Cir. 2008), and a suspect in certain nighttime burglaries, *see United States v. Mattarolo*, 209 F.3d 1153, 1158 (9th Cir. 2000).[8] On the other hand, when a person is

---

[8] Of course, suspicion of a crime likely to involve weapons is not the end of the matter. Under the totality-of-the-circumstances analysis, additional facts may sufficiently dispel an officer's suspicion. *See Thomas*, 863 F.2d at 628–29 (holding a frisk was unlawful where, after the suspects were stopped and exited their vehicle, their clothing did not match the description of the reported perpetrators); 4 Wayne R. LaFave, *Search & Seizure* § 9.6(a) (5th ed. 2015) ("[I]t should not be assumed that whatever might happen between the initiation of the stop and the initiation of the frisk is of no relevance, for this is not the case. If by investigation or happenstance the quantum of evidence needed to justify a forcible stop has dissipated during this interval, then it is not permissible to frisk."); *cf. Terry*, 392 U.S. at 28, 30 (noting nothing dispelled the officer's suspicions that Terry was armed). Even where the type of crime is likely to involve weapons, we consider the totality of the circumstances to determine whether the suspicion is actually justified in context and whether any suspicion was dispelled by other facts known to the officer. *See, e.g.*, *Johnson*, 581 F.3d at 1000 (officers personally observed many tell-tale signs of a bank robbery plan unfolding before them); *Davis*, 530 F.3d at 1082 (distinguishing a suspect who had access to a private residence growing marijuana on a large scale from one who was in a public place

being investigated for a crime that is neither "likely to involve the use of weapons," *Terry*, 392 U.S. at 28, nor "frequently associated with weapons," *Flatter*, 456 F.3d at 1158, suspicion of such a crime does not provide reason to suspect a person is armed. *See id.* (suspicion of mail theft is insufficient); *Thomas*, 863 F.2d at 629 (same with passing counterfeit money); *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1022 (9th Cir. 2009) (same with illicit drug use). We have not previously addressed whether domestic violence is the type of crime that is likely to involve weapons, such that the nature of the crime itself may provide suspicion a suspect is armed. We address that issue now, and hold domestic violence is not a crime such as bank robbery or trafficking in large quantities of drugs that is, as a general matter, likely to involve the use of weapons. Thus, officers may not rely solely on the domestic violence nature of a call to establish reasonable suspicion for a frisk. *See* 4 Wayne R. LaFave, *Search & Seizure* § 9.6(a) (5th ed. 2015) (describing a "minor assault without weapons" as the type of crime that does not, absent other circumstances, give rise to a reasonable suspicion a suspect is armed).[9]

Dillard's argument, accepted by our dissenting colleague, that the mere fact an officer is responding to a perceived

---

and had only a loose association with drug dealers); *$109,179 in U.S. Currency*, 228 F.3d at 1085–87 (drug trafficking suspect failed to identify himself, provided inconsistent answers to an officer's questions and was confronted in a confined hotel room); *Mattarolo*, 209 F.3d at 1158 (after being stopped on a remote stretch of road, a nighttime burglary suspect got out of his car and quickly approached the officer's squad car).

[9] We likewise have found no case law to suggest the California courts would presume a suspect is armed and dangerous based solely on the domestic violence nature of a call.

domestic violence call establishes reasonable suspicion a suspect is armed and dangerous ignores the broad scope of conduct encompassed by the term domestic violence, especially under California law. *See* Cal. Penal Code § 13700(b) (defining "domestic violence" to include any "abuse committed against an adult or a minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship"); *id.* § 13700(a) (defining "abuse" to include "intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another"). Domestic violence comes in widely varying degrees of dangerousness. It "is a term of art encompassing acts that one might not characterize as 'violent' in a nondomestic context." *United States v. Castleman*, 134 S. Ct. 1405, 1411 (2014). It can involve conduct as minor as squeezing another's arm to create a bruise, *see id.* at 1412, or as serious as rape, *see People v. Poplar*, 83 Cal. Rptr. 2d 320, 326 (Ct. App. 1999), or homicide, *see Castleman*, 134 S. Ct. at 1408–09.

As a general category of crime, therefore, domestic violence is clearly distinguishable from the more specific crimes the Supreme Court and this court have held are likely to involve the use of weapons, such as the daytime store robbery in *Terry*, bank robbery or narcotics trafficking. Although mail theft and bank robbery both fall under the category of theft offenses, only the latter gives rise to suspicion a suspect is armed. *Compare Flatter*, 456 F.3d at 1158, *with Johnson*, 581 F.3d at 1000. Likewise, illicit drug use, large-scale marijuana cultivation and narcotics trafficking are all drug offenses, but only the latter two give rise to reasonable suspicion for a *Terry* frisk. *Compare*

*Ramirez*, 560 F.3d at 1022, *with Davis*, 530 F.3d at 1082–83, *and $109,179 in U.S. Currency*, 228 F.3d at 1086–87.  As with the general categories of theft and drug offenses, domestic violence encompasses too broad an array of crimes to categorically justify reasonable suspicion under *Terry* and its progeny.

Given the breadth of domestic violence, the specific circumstances of a call must be factored into the reasonable suspicion analysis.  Some domestic violence calls may pose serious threats to officers, such as those requiring an officer to enter a suspect's home and intervene in the middle of a heated fight or vicious attack.  *See Mattos*, 661 F.3d at 457 (Kozinski, C.J., concurring in part and dissenting in part) (noting that by entering the home, officers may "become targets of fear and anger" and are "in close quarters, 'at the disadvantage of being on [their] adversary's turf'" (quoting *Buie*, 494 U.S. at 333)).  Other examples are those involving a suspect angrily threatening a responding officer to get off his property, *see Reed v. Hoy*, 909 F.2d 324, 325 (9th Cir. 1989), *overruled on other grounds by Edgerly v. City & Cty. of San Francisco*, 599 F.3d 946, 956 n.14 (9th Cir. 2010), or a report of a suspect wielding a gun, *see George v. Morris*, 736 F.3d 829, 832 (9th Cir. 2013).  But not all domestic violence calls present such risks.  Reasonable suspicion must be based on "specific and articulable facts" regarding the suspect and the "particular circumstances," rather than "unparticularized suspicion."  *Terry*, 392 U.S. at 21, 27. "This demand for specificity in the information upon which police action is predicated is the central teaching of [the Supreme] Court's Fourth Amendment jurisprudence." *Id.* at 21 n.18.  We reject the notion there is a blanket "domestic violence" exception to *Terry*'s requirement for particularized suspicion.

Our Fourth Amendment jurisprudence in the areas of warrantless entry and excessive force confirms that domestic violence suspects are not presumed to be armed. We have recognized, of course, that some domestic violence calls are dangerous and some domestic violence suspects are armed. In *United States v. Martinez*, 406 F.3d 1160 (9th Cir. 2005), for example, we noted "the combustible nature of domestic disputes," *id.* at 1165 (quoting *Tierney v. Davidson*, 133 F.3d 189, 197 (2d Cir. 1998)), explaining:

> The volatility of situations involving domestic violence make them particularly well-suited for an application of the emergency doctrine. When officers respond to a domestic abuse call, they understand that "violence may be lurking and explode with little warning." *Fletcher v. Clinton*, 196 F.3d 41, 50 (1st Cir. 1999). Indeed, "more officers are killed or injured on domestic violence calls than on any other type of call." Hearings before Senate Judiciary Committee, 1994 WL 530624 (F.D.C.H.) . . . .

*Id.* at 1164 (quoting congressional testimony by Sam Baca, then Chief of Police of Lakeland, Florida, Sept. 29, 1994[10]); *see also Hiibel v. Sixth Judicial Dist. Court of Nevada*, 542 U.S. 177, 186 (2004) ("Officers called to investigate domestic disputes need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim."); *Mattos*,

---

[10] Although *Martinez* suggests this testimony was offered "on behalf of National Task Force on Domestic Violence," that does not appear to have been the case. *See* 1994 WL 530624.

661 F.3d at 450 ("We take very seriously the danger that domestic disputes pose to law enforcement officers . . . ."). We accept the proposition that domestic violence calls present a significant risk to police officers' safety, but to create a new category of crime justifying automatic frisks requires more than a showing that *some* domestic violence calls are dangerous.

Thomas and the dissent, moreover, appear to overstate the threats domestic violence calls as a category pose to police officers. *See* Shannon Meyer, PhD, Victim Specialist, Seattle Division, Federal Bureau of Investigation, & Randall H. Carroll, Chief of Police (Retired), Bellingham, Washington, Police Department and President, Profectus Consulting, *When Officers Die: Understanding Domestic Violence Calls for Service*, The Police Chief 78 (May 2011), http://www.policechiefmagazine.org/magazine/index.cfm?f useaction=display_arch&article_id=2378&issue_id=52011 (last visited Dec. 29, 2015) (although "it is widely believed that domestic violence calls pose the greatest threat to police officers' safety and that law enforcement officers are most likely to be injured or killed responding to this category of call . . . , the bulk of research does not actually support this perspective"; "when examined in context, domestic violence calls for service account for a relatively small proportion of the overall rate of police officers murders"); Joel Garner & Elizabeth Clemmer, National Institute of Justice, U.S. Department of Justice, *Danger to Police in Domestic Disturbances – A New Look*, Research in Brief 2–3 (Nov. 1986), http://files.eric.ed.gov/fulltext/ED295090.pdf (last visited Dec. 29, 2015) (finding no officer injuries or deaths in a study of 1,446 family disputes in Los Angeles). Creating a new class of presumptively armed and dangerous suspects

requires more than the dubious data Thomas and the dissent invoke.[11]

Our dissenting colleague also cites studies emphasizing the risks domestic violence poses to victims. Dissent at 56, 64–65. *See* Callie Marie Renninson, Ph.D., Intimate Partner Violence and Age of Victim, 1993–99, Bureau of Justice Statistics Special Report (rev. 11/28/01), at 7 ("An average of 15% of intimate partner violence victims were involved in a victimization in which the offender had a weapon."); Susan B. Sorenson, Ph.D., & Douglas J. Wiebe, Ph.D., *Weapons in the Lives of Battered Women*, 94 Am. J. Pub. Health 1413 (2004) (36.7 percent of residents of California battered women's shelters reported that, at some point during their lives, an intimate partner used a firearm to hurt, threaten or scare them); When Men Murder Women: An Analysis of 2011 Homicide Data, Violence Policy Center (September 2013), at 6 ("Of the females killed with a firearm, nearly two-thirds were murdered by male intimates."). These risks are undeniable and immensely serious, but the breadth of police

---

[11] Relying on FBI data, for example, Thomas' expert asserts that 31.7 percent of officer assaults and 12.7 percent of officer deaths occurred while answering domestic violence calls in 2011. But the actual FBI data belie these claims. In fact, 2.7 percent – not 12.7 percent – of officer deaths occurred while responding to "domestic disturbance" calls, and this type of call includes a variety of domestic disturbances, not merely domestic violence calls. *See* FBI, *Law Enforcement Officers Killed & Assaulted 2011*, tbl. 19, https://www.fbi.gov/about-us/cjis/ucr/leoka/2011/tables/table-19 (last visited Dec. 29, 2015). Similarly, although 33 percent of officer assaults occurred when responding to "disturbance calls," *see id.* at tbl. 69, https://www.fbi.gov/about-us/cjis/ucr/leoka/2011/tables/table-69 (last visited Dec. 29, 2015), that broad category of calls includes not only domestic violence but also bar fights, gang calls, general disturbances, incidents where a citizen is brandishing a firearm and other types of domestic disturbances. *See* Garner & Clemmer, *supra*, at 2.

calls falling under the rubric of "domestic violence" is so great that the perceived "domestic violence" nature of a call cannot, in every case and without more, establish a reasonable suspicion a particular suspect is armed. Nothing in these studies gave Dillard reason to suspect that Thomas, in particular, was armed and dangerous.

Plainly, domestic violence calls vary widely in the actual threats they pose to officers and others. An officer therefore must consider the specific factual circumstances of an encounter to justify a particular search or seizure, as our jurisprudence in the areas of warrantless entry and excessive force bear out. In *Martinez*, for example, we considered whether it was reasonable for an officer to enter a house without a warrant during an ongoing, volatile domestic dispute. In upholding the warrantless entry, we did not simply rely on the fact that the officer was responding to a domestic violence call or the generalized risk such calls can pose to officer safety. We looked to the *specific circumstances* the officer encountered: he was responding to an interrupted 911 call reporting a man who was "out of control," he had previously been called to the residence for domestic violence, where he noticed the woman's "fat lip," and when he arrived at the scene he saw a woman crying in the front yard and a man yelling angrily from inside the residence. *See Martinez*, 406 F.3d at 1162–63. The highly charged and rapidly developing situation in *Martinez* stands in stark contrast to this case, in which Thomas was neither aggressive nor confrontational, there was no sign of ongoing (or completed) domestic violence and Thomas stood virtually motionless for six minutes while Dillard trained his Taser on him. There was minimal objective risk here that violence would "explode with little warning." *Id.* at 1164.

Two years later, in *United States v. Black*, 482 F.3d 1035 (9th Cir. 2007), we once again "stopped short of holding that 'domestic abuse cases create a per se exigent need for warrantless entry,'" explaining that we evaluate, "on a case-by-case basis, whether the 'total circumstances, presented to the law officer before a search . . . relieved the officer of the customary need for a prior warrant.'" *Id.* at 1040 (alteration in original) (quoting *United States v. Brooks*, 367 F.3d 1128, 1136 (9th Cir. 2004)). We held a warrantless entry into a man's apartment was justified in the interest of the welfare of a domestic abuse victim who had called 911 and reported that the man had beaten her up that morning in the apartment and that he had a gun, and the police reasonably believed she might be inside and badly injured. *See id.* at 1039. As with *Martinez*, the scene in *Black* was much more dangerous and uncertain than it was in this case.

Our en banc court held in the context of an excessive force challenge that mere suspicion of domestic violence did "not reveal any basis" for believing a suspect was armed. *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc). There, the suspect's wife had placed an emergency call reporting her husband was hitting her and had grabbed her breast very hard, but did not have a gun. *See id.* at 693, 702. When officers arrived, the suspect initially refused to take his hands out of his pockets, entered and exited his home, shouted expletives at the officers, but then eventually took his hands out of his pockets and remained in plain view of the officers. *See id.* Though acknowledging the "seriousness and reprehensibility of domestic abuse," we concluded on these facts "[t]he record does not reveal *any basis for believing that Smith was armed* or that he posed an immediate threat to anyone's safety." *Id.* at 702 (emphasis added). In contrast to the suspect in *Smith*, Thomas was not

aggressive to the police, he kept his hands and body in plain view at all times and Husky vehemently denied he had abused her.[12]

In the years since we decided *Smith*, *Martinez* and *Black*, our decisions have continued to demonstrate that Fourth Amendment challenges in the context of domestic violence turn on the specific facts of the case, considered in their totality. We have never suggested that a suspicion of "domestic violence" alone provides sufficient justification for a given police intrusion. *See George*, 736 F.3d at 839 (acknowledging the safety concerns arising from domestic violence calls but holding such concerns are diminished when the dispute appears to have concluded by the time the officers arrive on scene); *Mattos*, 661 F.3d at 451 (holding the use of a Taser on a woman intervening to discourage officers from arresting her abusive husband constituted excessive force in part because there was "no threat that either spouse ha[d] a weapon"). The mere fact that Dillard was responding to a perceived domestic violence call, therefore, did not establish reasonable suspicion to believe Thomas was armed and dangerous.

Nor did the specific facts of *this* "domestic violence" call do so. On the facts presented here, the perceived domestic violence nature of the call provided scant reason to believe Thomas was armed and dangerous. Campus police dispatch

---

[12] Although the dissent says Thomas "refused to move his hands from his waistline" (Dissent at 52), in fact Thomas stood facing Dillard with his "hands hanging at [his] sides, in a manner that would be considered normal if [he] was standing and making casual conversation with someone." He "never made any overt movements with [his] hands at any time in relation to [his] waistline."

had reported that a person matching Thomas' description, a man with a purple shirt, was seen pushing a woman on a public street on campus. Forty minutes earlier, Dillard had received a vague report of "domestic violence" at no particular location on campus. Combining the inferences Dillard could have reasonably drawn from these two calls, at most he had particularized suspicion that Thomas and Husky were in a domestic relationship and Thomas had been pushing Husky. The specific type of "domestic violence" call Dillard thought he was responding to, then, was a simple battery within a domestic relationship. *See* Cal. Penal Code § 243(e)(1). Dillard's questioning of Thomas and Husky confirms this was the full extent of his suspicion. He asked Husky and Thomas if they had been "fighting or arguing" or whether Thomas was "pushing her around." There were no facts suggesting to a reasonable officer that any specific physical contact beyond pushing was occurring, and the couple strongly denied that even that had occurred, with the supposed victim professing she and her boyfriend had instead been kissing.

Even assuming a reasonable officer could still reasonably suspect Thomas had pushed Husky despite the denials, no reasonable officer could assume all persons involved in a simple domestic battery are, as a categorical matter, likely to be armed and dangerous. An inference that Thomas was armed could be drawn only in the presence of other circumstances that were not present here. As discussed below, Thomas' appearance and behavior gave no suggestion he was armed. Thomas was in a location where he was entitled to be, answered Dillard's questions forthrightly, faced Dillard with his hands fully visible in the afternoon sunlight and made no overt movements suggesting he was arming

himself. There were no suspicious bulges in the T-shirt or any other item of Thomas' clothing.

Moreover, even if Dillard reasonably could have feared at the time he received the call that the most toxic and volatile sort of domestic dispute might await him at the scene, these fears should have been dispelled by what he encountered at the scene. There were no signs Thomas had attacked Husky, she vehemently and repeatedly denied Thomas was fighting with her (much less abusing her), she insisted she and Thomas had been kissing and Thomas was reasonably cooperative and nonthreatening.[13]

---

[13] The dissent mentions law review articles reporting that domestic violence victims often decline to cooperate with police and prosecutors. Dissent at 52–53. This is an important point, but it does not render Husky's statements and vigorous defense of Thomas irrelevant. The articles upon which the dissent relies, moreover, emphasize that "[v]ictims of domestic violence are more prone than other crime victims to recant or refuse to cooperate *after initially providing information to police.*" Tom Lininger, *Prosecuting Batterers After Crawford*, 91 Va. L. Rev. 747, 768 (2005) (emphasis added). "In a typical case, these various factors *do not deter cooperation with law enforcement in the immediate aftermath of the abuse*, but they begin to bear heavily on the victim in a matter of days." *Id.* at 771 (emphasis added); *cf.* Lisa Marie De Sanctis, *Bridging the Gap Between the Rules of Evidence and Justice for Victims of Domestic Violence*, 8 Yale J.L. & Feminism 359, 367–68 (1996) (noting "[m]any victims are uncooperative from the initial filing of the case," but citing only a 1995 telephone interview with a single assistant district attorney in one city for this proposition). Here, although Dillard may have been justified in viewing Husky's defense of Thomas with some skepticism, we do not see how it would have been reasonable to entirely discount her statements, especially when they were fully consistent with the other facts Dillard encountered at the scene, none of which suggested that domestic violence had occurred or was about to occur or that Thomas was armed and dangerous.

In sum, we hold the perceived domestic violence nature of the call did not automatically and categorically give Dillard reason to believe Thomas was armed and dangerous. Nor did the particular circumstances of this domestic violence call in particular, including the content of the call and the circumstances Dillard confronted on the scene, which we discuss in further detail below.

*(2) Appearing Startled or Fidgety.*   As one additional reason to believe Thomas was armed, Dillard points to Thomas' demeanor, suggesting Thomas appeared "startled and fidgety."  We do not see how either of these observations support even minimally the inference that Thomas was armed, however.  Although Dillard testified Thomas and Husky may have appeared "a little startled" when he first confronted them, he also explained that this was "a common reaction . . . when a police officer arrives on the scene."  By fidgety, Dillard meant only that Thomas and Husky exhibited normal hand movements, noting that it is not natural for people to stand in a perfectly still, statuesque form.  Thomas and Husky, in other words, behaved normally.  Such behavior does not give rise to reasonable suspicion to believe a suspect is armed and dangerous.

*(3) Thomas' Clothing.*   As further reason to believe Thomas was armed, Dillard points to the fact that Thomas was wearing an untucked T-shirt and jeans, "clothing capable of hiding a weapon."  We acknowledge that such clothing would do nothing to *dispel* the notion that Thomas was armed, but neither does it suggest that he was armed.  *See Ybarra*, 444 U.S. at 93 (holding there was no reason to believe a bar patron was armed where "the most [the officer] could point to was that [the patron] was wearing a 3/4-length lumber jacket, clothing which the State admits could be

expected on almost any tavern patron in Illinois in early March"); *Flatter*, 456 F.3d at 1158 (holding there was no reasonable suspicion a suspected mail thief was armed even though his "vest obscured his waistline"). That a person is normally dressed does not give rise to reasonable suspicion the person is armed and dangerous. Otherwise, innumerable college students everywhere could be frisked for weapons on appearance alone.

*(4) Withholding Consent to Search.* As further reason to believe Thomas was armed, Dillard points to Thomas' refusal to consent to a weapons search, even after Dillard explained the nature of his investigation. This fact too gave Dillard little or no reason to believe Thomas was armed. Thomas was free to decline Dillard's request. *See Bostick*, 501 U.S. at 437. As the district court explained:

> An individual's steadfast refusal to consent to a search cannot become the basis for reasonable suspicion, absent any other specific facts, to justify a forced search of that individual. If that were the case, the Fourth Amendment would have no effect. An officer without reasonable suspicion that an individual was armed, could simply generate reasonable suspicion by asking an otherwise non-threatening suspect to submit to a search and if he declined the officer would then have unfettered discretion to force him to submit.

*See also United States v. Santos*, 403 F.3d 1120, 1125–26 (10th Cir. 2005) ("A refusal to consent to a search cannot itself form the basis for reasonable suspicion . . . . If refusal of consent were a basis for reasonable suspicion, nothing

would be left of Fourth Amendment protections."); *United States v. Boyce*, 351 F.3d 1102, 1110 (11th Cir. 2003) ("The police cannot base their decision to prolong a traffic stop on the detainee's refusal to consent to a search. Such a refusal may only be considered when the police have already observed, before asking for permission to search, facts sufficient to raise a reasonable suspicion."); *United States v. Machuca-Barrera*, 261 F.3d 425, 435 n.32 (5th Cir. 2001) ("The mere fact that a person refuses to consent to search cannot be used as evidence in support of reasonable suspicion."); *cf. Graves v. City of Coeur D'Alene*, 339 F.3d 828, 842 (9th Cir. 2003) ("[T]hat [the suspect] refused to consent to search cannot be used to establish probable cause."), *abrogated on other grounds by Hiibel*, 542 U.S. 177.

*(5) Stepping Back.* The one sudden movement Thomas made, to step back in response to Dillard's reaching for Thomas to put him in a "controlled hold" to frisk him, also did not suggest Thomas was armed. A reactive, instinctive movement in response to an officer's own aggressive movement differs significantly from the unprovoked, sudden movements we have held may factor into reasonable suspicion. The latter type of movement has a volitional quality, indicating a suspect's "attempt[] to take advantage of the situation by arming [him]self." *Flippin*, 924 F.2d at 164–66 (holding a suspect's sudden grabbing of a make-up bag while under investigative detention by an officer in her hotel room, coupled with the officer's knowledge that her companion had been carrying a large knife, suggested an attempt to arm herself); *see Burkett*, 612 F.3d at 1107 (holding an officer was justified in frisking a car passenger where the driver took a suspiciously long time to pull over while the passenger was making furtive movements not

visible to the officer and then kept one hand in an unnatural position on his body when he exited the vehicle); *United States v. Taylor*, 716 F.2d 701, 708–09 (9th Cir. 1983) (during a stop of a methamphetamine manufacturing suspect, a passenger refused to show his hands, making furtive movements inside a truck as officers approached).  In response to Dillard's reaching for him, Thomas stepped back a couple feet, stopped, remained facing Dillard, and made no movement with his hands or any other part of his body.  In judging the significance of this interaction, we are mindful that Dillard had no justification to put Thomas in a controlled hold to search him to begin with, as the remainder of our reasonable suspicion analysis makes clear.  *See Thomas*, 863 F.2d at 630 ("The way [an officer] conduct[s] his investigation . . . cannot be used to bootstrap a justification for the detention and frisk of [a suspect].").  This movement, when considered in context, does not suggest Thomas was arming himself.

To summarize, none of the circumstances at the scene of this encounter justified a reasonable suspicion Thomas was armed and dangerous.  Even if Dillard reasonably believed he was investigating a potential domestic violence incident, that did not automatically give him the right to frisk Thomas.  Domestic violence encompasses too many criminal acts of varying degrees of seriousness for an officer to form reasonable suspicion a suspect is armed from that label alone.  "Unless an officer can point to specific facts that demonstrate reasonable suspicion that the individual is armed and dangerous, the Fourth Amendment tolerates no frisk." *Ramirez*, 560 F.3d at 1022 (citing *Knowles v. Iowa*, 525 U.S. 113, 117–19 (1998)).  From the facts he knew once he actually confronted Thomas at the scene, Dillard could not reasonably suspect Thomas was armed and dangerous.

Dillard violated the Fourth Amendment by detaining Thomas, under threat of a Taser, to conduct a suspicionless frisk.[14]

Our dissenting colleague would hold that "the nature of a domestic violence call justifies an officer's formulation of a reasonable suspicion that a suspect may be armed (in the absence of mitigating circumstances)." Dissent at 64. According to the dissent, our opinion "requires a law enforcement officer to face potential liability unless he leaves a domestic violence scene without any assurance that the abuser is not armed and will not again inflict violence on the victim – only next time, with a gun." Dissent at 64. We

---

[14] Because we focus on the objective question of whether a reasonable officer would have been justified in believing Thomas was armed, *see Terry*, 392 U.S. at 21–22; *Delaware v. Prouse*, 440 U.S. 648, 654 (1979), we have not considered Dillard's subjective decisionmaking. Nonetheless, we note Dillard's decisionmaking was troubling in several respects. Dillard testified he believed Thomas was armed and decided to search him *solely* because of the perceived domestic violence nature of the call. As we explain in text, these assumptions were unreasonable given the wide range of conduct classified as "domestic violence" and the need to consider the totality of the circumstances. In addition, Dillard testified he decided he would search Thomas even before he arrived on the scene, making clear that he would have conducted the search even if the facts he encountered on the scene dispelled any reason he may have had to believe Thomas was armed. As the district court pointed out, "[b]y his own account, Officer Dillard gave no consideration to the actual facts he observed; he was on a mission to search Thomas no matter what." These actions were not consistent with the Fourth Amendment. Even if Dillard reasonably could presume Thomas was armed from the perceived domestic violence nature of the call alone (and he could not), he could not reasonably decide to follow that preconceived plan irrespective of the suspicion-negating facts he encountered at the scene. An officer is not free to ignore the actual circumstances he encounters in favor of a personal policy that he will execute a patdown frisk whenever he responds to a call concerning a perceived domestic dispute.

respectfully disagree.  The domestic violence nature of a call is certainly relevant to an officer's assessment of whether to conduct a search for weapons.  Indeed, "[e]rring on the side of caution is exactly what we expect of conscientious police officers" confronting domestic violence.  *Black*, 482 F.3d at 1040.  But reasonable suspicion is not established merely because an officer perceives a call as falling under the broad rubric of "domestic violence."  The officer's decision to conduct a frisk must be based on the totality of the circumstances, including the full nature and context of the call and the facts the officer actually observes on the scene. A vague call about an unarmed man pushing a woman in a public place on a college campus, without more, does not give rise to a conclusive reasonable suspicion that the man is armed and dangerous.  Nor did the facts Dillard became aware of when he actually confronted Thomas.  He saw no evidence that an assault had occurred, and Husky vehemently denied that it had.  Nothing in our decision prevents a law enforcement officer from conducting a frisk when the circumstances call for it.  The circumstances here did not.

## 2.  Clearly Established Law

We next address whether Thomas' constitutional right to be free from an unlawful detention for the purpose of conducting a suspicionless frisk was "'clearly established in light of the specific context of the case' at the time of the events in question."  *Mattos*, 661 F.3d at 440 (quoting *Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009)).  "An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it. . . ."  *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (brackets and internal

quotation marks omitted).    Qualified immunity "gives
government officials breathing room to make reasonable but
mistaken judgments, and protects all but the plainly
incompetent or those who knowingly violate the law."
*Stanton v. Sims*, 134 S. Ct. 3, 5 (2013) (internal quotation
marks omitted).  "We do not require a case directly on point,
but existing precedent must have placed the statutory or
constitutional question beyond debate." *Ashcroft v. al-Kidd*,
131 S. Ct. 2074, 2083 (2011).

The case law has defined with some specificity the types
of circumstances that give rise to reasonable suspicion for a
*Terry* frisk, as well as those that do not.  At the time at issue,
September 2010, it was clearly established that a frisk for
weapons, on less suspicion than probable cause for a search,
was authorized only when an officer had reasonable suspicion
a suspect was "armed and presently dangerous to the officer
or to others." *Terry*, 392 U.S. at 24; *Ramirez*, 560 F.3d at
1023 ("[I]t was clearly established [in 2003] that *every
patdown* is unreasonable unless it is supported by the
officer's reasonable suspicion that the person to be frisked is
armed and dangerous." (emphasis added)).  It was clearly
established that an officer must rely on "specific and
articulable facts" and "rational inferences from those facts"
that provide such suspicion, and may not rely on "inchoate
and unparticularized suspicion or [a] 'hunch.'"    *Terry*,
392 U.S. at 21, 27.  It was clearly established that an officer
must consider the totality of the circumstances, including
whether the facts of a particular encounter serve to dispel any
preexisting suspicion. *See id.* at 28; *United States v. Thomas*,
863 F.2d 622, 628–29 (9th Cir. 1988).

*Ybarra* clearly established that reasonable suspicion
requires an officer to point to specific facts indicating a

*particular* suspect is armed.  *See* 444 U.S. 85, 92–94 (1979); *see also Buie*, 494 U.S. at 334 n.2.  *Ybarra* and a number of subsequent controlling cases we have already cited identified the many behaviors and physical characteristics of an individual that can provide a reason to believe someone is armed.  None of these suspicious circumstances applied to Thomas.  Based on appearance and observation alone, Thomas posed no more of a threat than the bar patron the Supreme Court held should not have been frisked in *Ybarra*. *See* 444 U.S. at 93–94.

Nonetheless, despite the many cases that have given shape to the contours of the reasonable suspicion requirement for a *Terry* frisk, given the Supreme Court's demanding standard we are compelled to conclude it would not have been clear to "any reasonable official" in Dillard's position that demanding to frisk a person suspected of domestic violence was unlawful.  *See Sheehan*, 135 S. Ct. at 1774.  The cases had established that reasonable suspicion for a *Terry* frisk may arise when the crime an individual is suspected of committing is "likely to involve the use of weapons."  *Terry*, 392 U.S. at 28; *see Flatter*, 456 F.3d at 1158.  Although no court had held domestic violence was such a crime, there was some language in our cases suggesting domestic violence *might* qualify.  In *Martinez*, for example, we said, "[w]hen officers respond to a domestic abuse call, they understand that violence may be lurking and explode with little warning." 406 F.3d at 1164 (internal quotation marks omitted). Although we had held that domestic violence provided insufficient justification on its own to authorize entering a home without a warrant, *see Black*, 482 F.3d at 1040, we had never specifically applied that principle to *Terry* frisks, which are justified on less suspicion than the probable cause required for a warrant.  Similarly, although we held in *Smith*

that suspicion of domestic violence provided no reason to believe a suspect was armed (at least where the suspect's wife had informed the police that he had no guns or weapons in the house), that was in the context of an excessive force claim, *see* 394 F.3d at 702–03.

An officer in Dillard's shoes, who would certainly be aware of the potential dangers involved in domestic violence calls, cannot be said to have been "plainly incompetent" for believing suspicion of domestic violence provided reason to believe a suspect is armed and dangerous. *See Stanton*, 134 S. Ct. at 5. Although this view was mistaken, it was not unreasonably mistaken. *See id.* Dillard is therefore entitled to qualified immunity on Thomas' claim that Dillard unlawfully detained him for the purpose of a suspicionless frisk.

The district court denied qualified immunity because, "[a]t the time Officer Dillard tased Thomas to force his compliance with a weapons' search, it was clearly established that such a search is unreasonable unless supported by the officer's reasonable suspicion that the person to be searched is armed and dangerous." The Supreme Court, however, has "repeatedly told courts not to define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014) (alteration, citation and internal quotation marks omitted). Before today, we had never squarely held that domestic violence is not a crime such as bank robbery or drug trafficking that is, as a general matter, likely to involve the use of weapons. In light of cases such as *$109,179 in U.S. Currency*, 228 F.3d at 1086, holding that some crimes are strongly associated with armed suspects,

as well as cases such as *Martinez*, 406 F.3d at 1164–65, acknowledging the danger posed by at least some domestic violence calls, whether all domestic violence crimes presumptively justify a weapons frisk was not, until now, beyond debate.

### 3. The Continued Detention

Once Dillard initiated Thomas' detention for the purpose of a weapons frisk, the constitutional violation was complete. Nonetheless, Dillard highlights an event subsequent to his initiation of the detention that he argues provided reasonable suspicion Thomas was armed. After Dillard had drawn his Taser, he ordered Thomas to put his hands up, step forward and drop to his knees to permit a search for weapons; but Thomas refused to do so, multiple times, until the Escondido officer pointed her gun at him, at which point he raised his hands. Assuming without deciding that an officer's conduct in executing an unlawful detention can prompt a suspicious reaction in the detainee that makes the continued detention lawful, *but see Thomas*, 863 F.2d at 630, Thomas' refusal to comply with Dillard's commands failed to justify the continued detention here.

Although noncompliant behavior can contribute to reasonable suspicion a suspect is armed, *see Burkett*, 612 F.3d at 1107, here it provided no basis for believing Thomas was armed. Although Thomas refused to raise his hands and kneel, he stood still and his hands were empty and plainly visible throughout the entire six minutes he was being detained under threat of Dillard's Taser. Again, he had no suspicious bulges suggesting he had a weapon, there had been no report he had a weapon and the crime for which he was being investigated was not likely to involve the use of

weapons. Thomas had been forthright with Dillard from the beginning, providing his identity and answering his questions directly. Husky was adamant that Thomas had done nothing wrong. In context, Thomas' steadfast, passive resistance to Dillard's insistence that he offer himself to be searched does not tip the balance in favor of reasonable suspicion to frisk. *See Smith*, 394 F.3d at 702 (holding there was "not . . . any basis" for suspecting a domestic violence suspect was armed – even after he had initially refused officers' order to take his hands out of his pockets, had gone in and out of his house and had yelled expletives at officers – in part because his hands were plainly visible when the officers used force to detain him). Thomas' refusal to raise his hands and kneel for an unlawful frisk did not make the remainder of the detention lawful. Nonetheless, because we hold it was not clearly established that Dillard's initial demand for a frisk was unlawful, neither was it clearly established that continuing to detain a noncompliant domestic violence suspect for the purpose of executing a frisk was unlawful. Dillard is entitled to qualified immunity for that portion of the detention as well.

## C. Excessive Force

We next address whether, when Dillard shot Thomas with his Taser, he used excessive force in violation of the Fourth Amendment, and if so, whether that violation was clearly established in 2010.

### 1. Constitutional Violation

"[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Accordingly, law

enforcement may use objectively reasonable force to carry out investigatory stops. *See Green v. City & Cty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014). Under *Graham*, "[d]etermining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Mattos*, 661 F.3d at 441 (alteration in original) (quoting *Graham*, 490 U.S. at 396) (internal quotation marks omitted). "We apply *Graham* by first considering the nature and quality of the alleged intrusion; we then consider the governmental interests at stake by looking at (1) how severe the crime at issue is, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Id.* These factors are not exclusive; "we examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*." *Id.* (quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)) (internal quotation marks omitted). The most important factor is whether the suspect posed an immediate threat to the safety of the officers or others. *See id.*

To determine whether officers used excessive force to carry out an *unlawful* frisk, we do not, as the Tenth Circuit has suggested, ask whether the officers used greater force than would have been reasonably necessary to effect a *lawful* frisk. *See Cortez v. McCauley*, 478 F.3d 1108, 1127 (10th Cir. 2007) (en banc). As we explained in *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1024–26 (9th Cir. 2015), that approach would be contrary to *Graham*. Because "'it is the *need* for force which is at the heart of the *Graham* factors'

. . . , the facts underlying the seizure are pertinent in judging the overall reasonableness of the seizure for Fourth Amendment purposes, including the reasonableness of the force used to effectuate the seizure." *Id.* at 1025 (quoting *Blankenhorn v. City of Orange*, 485 F.3d 463, 480 (9th Cir. 2007)).  Thus, that Dillard had no reason to believe Thomas was armed and dangerous, and hence no need to conduct a frisk, is relevant – indeed, highly relevant – to the excessive force analysis.

We first consider the nature of the force applied.  Using a Taser in dart mode constitutes an "intermediate, significant level of force."  *Bryan*, 630 F.3d at 826.

> The pain is intense, is felt throughout the body, and is administered by effectively commandeering the victim's muscles and nerves.  Beyond the experience of pain, tasers result in immobilization, disorientation, loss of balance, and weakness, even after the electrical current has ended.  Moreover, tasering a person may result in serious injuries when intense pain and loss of muscle control cause a sudden and uncontrolled fall.*Id.* at 825 (citations and internal quotation marks omitted).  The experience of being shot with a Taser is a "painful and frightening blow."

*Id.* at 826 (quoting *Orem v. Rephann*, 523 F.3d 442, 448 (4th Cir. 2008)).

Turning to the governmental interests at stake, we first consider the severity of the crime at issue.  Any form of domestic violence is serious, but the allegation in this case

was not particularly severe. Thomas was stopped for suspicion of pushing a woman. Dillard observed no signs Husky was injured or distressed. She vehemently denied Thomas had abused her and instead insisted they were kissing behind the storage containers before Dillard arrived.

Regarding the second *Graham* factor, Dillard had scant reason to believe Thomas posed an immediate threat to him or anyone else. From the moment Dillard approached Thomas and Husky, Thomas stood facing the officer with his hands at his sides. He had been cooperative, aside from refusing to raise his hands, kneel and be frisked, and he never acted aggressively or belligerently toward the officer. He stepped backward at one point when Dillard tried to grab his arm. But as we noted before, Dillard had no justification for grabbing him, it was a brief reaction to Dillard's own sudden movement and Thomas remained facing Dillard with his hands at his sides and in full view. In addition, as noted, Dillard had no reason to believe Thomas was armed.

Regarding the third *Graham* factor, Thomas gave no indication he was going to flee, and his resistance was mostly passive. He stood facing Dillard with his hands by his sides for approximately six minutes as Dillard sought his compliance in carrying out the frisk. Although Thomas resisted Dillard's commands to permit a frisk, by refusing to raise his hands and kneel, he did so "passively" and not "actively." *See Forrester v. City of San Diego*, 25 F.3d 804, 805 (9th Cir. 1994) (characterizing as passive resistance protestors "remaining seated, refusing to move, and refusing to bear weight" despite police orders to the contrary). Had there been a bona fide need to frisk Thomas for weapons, then some force may have been justified in compelling Thomas' compliance. As we have explained, however, there

was no justification for conducting a frisk, so Thomas' peaceful resistance to what he correctly perceived to be an unlawful search did not justify this use of force. Although Dillard argues the force used was reasonable, he does so solely on the flawed premise that the frisk was "constitutionally sound," arguing he "had an urgent need to ensure [his] safety . . . by conducting a weapons' search." He does not argue the use of force was reasonable even if the frisk was unjustified. Accordingly, the use of force was objectively unreasonable, violating Thomas' Fourth Amendment rights against excessive force. *See Graham*, 490 U.S. at 397.

### 2. Clearly Established Law

Dillard argues that at the time of his encounter with Thomas, the law in this circuit was unsettled as to what circumstances constituted an excessive use of a Taser and, therefore, it would not have been clear to an officer confronting a suspect who was unwilling to submit to what he perceived to be a lawful weapons search that he could not use his Taser to carry out the search. We must agree.

Although we conclude Dillard's use of the Taser constituted excessive force, the facts of the cases existing at the time are not so closely analogous to this case such that Dillard's mistaken view of the law was unreasonable. *See Stanton*, 134 S. Ct. at 5. It is true that in *Smith* we held the use of force on a more threatening and noncompliant suspect than Thomas was unjustified. *See* 394 F.3d at 702–03. The level of force used in that case, however, was more severe than Dillard's use of a Taser. The officers repeatedly sicced police dogs on Smith, blasted him with pepper spray four times, tackled him and dragged him face down off his porch.

*See id.* at 703–04. *Smith* would not have made clear just how much of a threat a suspect must pose to justify the less severe level of force of a Taser.

*Bryan* was also distinguishable because, unlike Thomas, the suspect in that case was suspected of a traffic infraction, not domestic violence. *See* 630 F.3d at 822. Thomas also repeatedly rebuffed Dillard's attempt to frisk him, so he was less compliant than the suspect in *Bryan*, who got out of his car, contrary to the officer's order, and stood still. *See id.* Furthermore, although we hold Dillard had no justification for the frisk, and therefore Thomas' efforts to avoid the unlawful frisk provide little, if any, justification for the use of the Taser, we also hold Dillard was reasonably mistaken regarding his entitlement to frisk Thomas. His reasonable but mistaken belief regarding the frisk makes his application of force to perform the frisk more reasonable than that of the officer who used a Taser in *Bryan* with no such justification. Thomas offers no other authority holding the use of a Taser in an analogous situation was excessive.

Under the controlling case law in September 2010, therefore, it would not have been apparent to an officer in Dillard's shoes that using a Taser on a domestic violence suspect refusing to allow a frisk – whom the officer reasonably but mistakenly believed could be frisked – constituted excessive force. Dillard is therefore entitled to qualified immunity on Thomas' excessive force claim as well.

## IV. CONCLUSION

Viewing the evidence in the light most favorable to Thomas, the district court properly concluded Dillard violated

Thomas' Fourth Amendment rights against unlawful seizure and excessive force.  We hold the domestic violence nature of a police investigation is not alone enough to establish reasonable suspicion a suspect is armed.  We nonetheless hold Dillard is entitled to qualified immunity.  Because Dillard is entitled to qualified immunity, we also reverse the partial summary judgment granted to Thomas on the issue of liability.  *See Bull v. City & Cty. of San Francisco*, 595 F.3d 964, 982 (9th Cir. 2010); *Marks v. Clarke*, 102 F.3d 1012, 1018 (9th Cir. 1996).

**REVERSED.**  Costs on appeal are awarded to Thomas.

* * *

Thomas' motion to dismiss the appeal for lack of jurisdiction, filed November 13, 2014, is **DENIED**.

BEA, Circuit Judge, concurring in part and dissenting in part:

I concur in my colleagues' determination that Officer Dillard was entitled to qualified immunity on Correll Thomas' claims for unlawful seizure and excessive force under 42 U.S.C. § 1983, and that the district court's grant of partial summary judgment to Thomas must accordingly be reversed.  I write separately, however, because we have repeatedly (and correctly) recognized the unique dangers law enforcement officers face when responding to domestic violence calls—including the inherent volatility of a domestic violence scene, the unique dynamics of battered victims seeking to protect the perpetrators of abuse, the high rate of assaults on officers' person, and the likelihood that an abuser

may be armed. I would therefore hold that the domestic violence nature of the call *can* alone give rise to reasonable suspicion necessary to justify a *Terry* frisk.

I also write separately because I do not subscribe to the majority's holding that Dillard violated Thomas' Fourth Amendment right by detaining him for purposes of performing a *Terry* frisk. *See* Maj. Op. at 4. My colleagues reach this conclusion by ignoring the axiomatic rule that, at the qualified immunity stage, we review "the objective reasonableness of a particular seizure under the Fourth Amendment . . . . from the perspective 'of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014). Here, Officer Dillard responded to not one, but two, domestic violence radio calls, both reported in the span of 33 minutes. The first call reported domestic violence by a black male on the Escondido campus. The second indicated that a man wearing a purple shirt was being observed on a live video feed "pushing" a woman in a secluded part of campus. Officer Dillard encountered a black male wearing a purple shirt—a person matching the description of the suspect of *both* calls—in the area where at least one of the reported incidents of violence had been observed, with a female who identified herself as Thomas' girlfriend. These facts supported a reasonable inference of continuous domestic abuse lasting upwards of half an hour—a situation that the majority (incorrectly, in my view) minimizes as a "simple battery." *See* Maj. Op. at 28. True, there is evidence in the record that Thomas' girlfriend, Amy Husky, claimed that Thomas was just "playing around" when he concededly pushed Husky against the storage containers, but a reasonable officer operating without the benefit of hindsight and with the knowledge of the overwhelming frequency with which

domestic violence victims seek to protect their abusers, *see* discussion, *infra* at pp. 52–53, could have believed himself to be confronting a suspect capable of significant violence who might be armed.  By analyzing the circumstances confronting Officer Dillard through a rosy-hued lens of hindsight, the majority opinion deprives future law enforcement officers faced with domestic violence disputes of an important tool for protecting themselves and the citizens with whose safety they are entrusted.

## I.

It is hornbook law that, at the summary judgment stage, courts "are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) ("In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts.").  But it is equally axiomatic that, in determining whether a police officer is entitled to qualified immunity, we view the facts "from the perspective 'of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014).  My colleagues accept Thomas' version of the facts, but fail to consider how those facts would have looked to a reasonable officer on the scene. Properly viewed, the facts confronting Officer Dillard supported his formulation of a reasonable suspicion that Thomas may have been armed.

Officer Dillard received two police dispatches on the afternoon in question.  The first reported "domestic violence involving a black male" at the Escondido campus. Approximately thirty minutes later, and within minutes of Officer Dillard's arrival at the campus, a second police

dispatch came in, this time advising Officer Dillard that a male wearing a purple shirt was being observed on live security video pushing a female by some containers in the campus' biohazard storage area. Thus, *both* dispatches reported potential domestic violence by a male on a female on the Escondido campus.[1] Viewing the facts "from the perspective of a reasonable officer at the scene," the undisputed similarity between the calls gave rise to a reasonable inference that the reported domestic violence may have been occurring continuously from the time the first call came in through the time of the second (more than thirty minutes later). Officer Dillard, equipped with only this limited information, approached the location where the observed violence had occurred—an alley flanked by large storage containers. Officer Dillard testified that, given the nature of the call, the possibility of weapons was the "most important question on [his] mind." His training had taught him that "a domestic violence call can be a very dangerous call to a police officer" and that he stood a good likelihood of "getting seriously hurt or injured."

At first, Dillard could not locate the suspect. Only after reversing his car and driving down the alley a second time did Dillard spot Thomas and Husky emerging from behind some biohazard storage containers. Thomas, a black male, was wearing a long purple shirt, baggy jeans, skater shoes, a neck chain, an earring, and a black beanie. Thomas therefore matched perfectly the description of both dispatches. Moreover, Dillard found Thomas *with* Amy Husky, who shortly after encountering Officer Dillard yelled that Thomas

---

[1] As the majority points out, pushing a woman would qualify as domestic violence if the perpetrator and the victim were in a dating relationship. *See* Maj. Op. at 19–20.

was her "f***ing boyfriend" (establishing a domestic relationship).

Officer Dillard, who stands only five feet, six inches tall and weighs 155 pounds, exited his vehicle and walked approximately four steps, stopping ten feet away from the place where Thomas and Husky were standing. Officer Dillard concedes that he did not observe any visible injuries to Husky's person. Nor did Amy appear "distraught." Nevertheless, Dillard had been taught that a domestic violence scene, by its nature, is "very volatile"; people can "suddenly become violent or angry," making it important to secure the scene as quickly as possible, regardless of whether the officer encounters active violence upon arrival.

Officer Dillard initiated contact with the couple by telling Thomas and Husky, "No one is in trouble here." He asked the pair for identification and told them he was "investigating suspicious activity." Dillard then asked Thomas whether he had any weapons on him, and Thomas said "no." Officer Dillard asked Thomas if he would "mind" if Dillard nonetheless searched him for weapons—a "common question when investigating a possible domestic violence."[2] Thomas responded that he "did mind." Dillard tried to "deescalate" the situation, explaining that Thomas was not under arrest, but that Dillard was "investigating a male wearing a purple shirt pushing a girl around" and just needed to check Thomas for weapons to make sure the scene was safe. Thomas continued to say "no" in response to Officer Dillard's repeated requests that Thomas consent to a weapons search.

---

[2] Despite believing he had a right to conduct a *Terry* frisk, Officer Dillard asked Thomas for consent in efforts to avoid a physical altercation and to resolve the investigation peacefully.

For the next six minutes, Officer Dillard continued trying to elicit cooperation without resorting to force. When verbal commands did not work, Dillard stepped forward in an attempt to put Thomas in a control hold, but Thomas retreated closer to the "recessed" area by the storage containers where the couple had previously been concealed. Officer Dillard "backed off," afraid that Thomas might try to fight him in the "small, confined space," and withdrew his taser. Dillard told Thomas to put his hands in the air, to step forward, and to drop to his knees slowly. Thomas said "no." Dillard repeatedly commanded Thomas to raise his hands, but Thomas refused. Officer Dillard repeatedly commanded Thomas to move his hands away from his waistline—the area Dillard was concerned might conceal a weapon—but Thomas ignored that command, too. After this went on for six minutes, Dillard deployed his taser, feeling like that was the "final and only option" left to him.

These facts are undisputed. Indeed, the parties' recollection as to the encounter differs only slightly. Dillard testified that Husky did not say that the pair had been kissing until *after* the incident, at which point she also admitted that Thomas had pushed her. Thomas, on the other hand, declares that Husky told Dillard within the first moments of the encounter that the pair had "just [been] kissing" behind the containers. Thomas also recalls that Husky started "yelling" at some point during the stand-off that Thomas had "done nothing wrong." Finally, Thomas insists that at no time during the encounter did he act "belligerent[ly]" or "aggressive[ly]" toward Officer Dillard or anyone else.

But even crediting Thomas' version of events, we must consider how a reasonable officer would perceive this scene, armed only with the limited information available to Officer

Dillard. Officer Dillard encountered an individual suspected of significant domestic violence, who "appeared to be hiding behind the biohazard storage area" (a relatively secluded area of campus where even Thomas admits the couple had gone "for privacy"). Thomas and Husky appeared "startled" by Officer Dillard's presence. Officer Dillard perceived Thomas as "standoffish," in part because Thomas spoke in a low, serious tone. Contrary to my colleagues' suggestion, neither Thomas' statement that he was not "belligerent" nor any other evidence in the record contradicts Officer Dillard's perception of Thomas' manner. The majority opinion points out that, according to Thomas, Officer Dillard appeared "surprised" and then "angry and agitated" after Thomas refused to consent to a weapons search. But such a reaction would be a natural response to a confrontation with a suspect an officer reasonably suspects to be armed, who is refusing to permit the officer to conduct a weapons search.

It is also undisputed that Thomas refused to move his hands from his waistline, despite numerous requests. Thomas characterizes his hand placement as "normal if I was standing and making casual conversation with someone." But in light of Dillard's repeated requests that Thomas move his hands *away* from his waistline, a reasonable officer in Officer Dillard's position could well have perceived the natural "fidgeting" of Thomas' hands by his sides as an attempt to conceal a weapon. Of course, we know *now* that Thomas was not concealing a weapon in his waistband. But Officer Dillard—who reasonably believed he was dealing with a demonstrably violent, domestic violence suspect—had no way of knowing that.

The majority opinion makes much of Husky's statement to Dillard that the couple had just been "kissing." But it is

well-documented that victims of domestic violence—even those who initially report their abusers to police—more often than not "recant or refuse to cooperate" with the police seeking to help them. *See, e.g.*, Tom Lininger, *Prosecuting Batterers After Crawford*, 91 Va. L. Rev. 747, 751 (2005) ("Approximately 80 percent of victims decline to assist the government in prosecutions of domestic violence cases."); Lisa Marie De Sanctis, *Bridging the Gap Between the Rules of Evidence and Justice for Victims of Domestic Violence*, 8 Yale J.L. & Feminism 359, 367–68 (1996) ("[V]ictims of domestic violence are uncooperative in approximately eighty to ninety percent of cases. Many victims are uncooperative from the initial filing of the case . . . ."). Thus, even assuming that Husky was yelling at Officer Dillard that Thomas had done nothing wrong, a reasonable officer in Dillard's position could have discounted those statements as an effort by the victim of violence to protect her abuser. Thus, contrary to the majority's suggestion, the resolution of this factual discrepancy in Thomas' favor does not negate Dillard's reasonable belief that Thomas was a perpetrator of potentially severe and/or continuous domestic violence. Only with the benefit of hindsight do we know otherwise. Under these circumstances, Dillard reasonably believed that he had a duty, as a community caretaker, not to leave a domestic violence victim in the care of a demonstrably violent person without conducting a weapons search.

## II.

Thomas argues that the Fourth Amendment precluded Dillard from frisking Thomas for weapons under the circumstances presented here. Thomas additionally argues that this conclusion was clearly established as of September 2010, and thus Officer Dillard was not entitled to qualified

immunity. The qualified immunity inquiry is two-fold: It requires a violation of a constitutional right, and a finding that such right was clearly established at the time the violation occurred. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).[3] I agree with the majority's holding that it was *not* clearly established in September 2010 that Dillard's conduct was unconstitutional. However, I disagree with the majority's holding that Thomas has demonstrated a violation of his Fourth Amendment right, because I would find that a reasonable officer in Dillard's position could have formulated a reasonable suspicion that Thomas might be armed based on the facts available to Dillard here.

In determining whether Dillard's frisk violated a constitutional right, this court should bear in mind that a *Terry* frisk is a "protective search—permitted without a warrant and on the basis of reasonable suspicion." *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993). Unlike a full-blown arrest, "[t]he protective search for weapons . . . constitutes a brief, though far from inconsiderable, intrusion upon the sanctity of the person." *Terry v. Ohio*, 392 U.S. 1, 26 (1968). "[R]easonable suspicion" that a person is armed is enough—and this is "less than probable cause." *Minnesota*, 508 U.S. at 373. In other words, we must merely find that under "the facts available to the officer at that moment" a "man of reasonable caution" "might" believe that a person was "armed and presently dangerous." *Pennsylvania v. Mimms*, 434 U.S. 106, 111–12 (1977) (internal quotation marks omitted); *see also Gallegos v. City of Los Angeles*, 308 F.3d 987, 990 (9th Cir. 2002) ("The reasonable suspicion standard 'is a less demanding standard than probable cause,'

---

[3] Courts of appeal have discretion to address either prong first. *Pearson*, 555 U.S. at 236.

and merely requires 'a minimal level of objective justification.'" (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000))).

The majority today holds that, "although the domestic violence nature of a police investigation is a relevant consideration in assessing whether there is reason to believe a suspect is armed and dangerous, it is not alone sufficient to establish reasonable suspicion." Maj. Op. at 4. I disagree.

It is well-established that the nature of a suspected crime can *alone* support a reasonable suspicion that a suspect might be armed—even where the officer does not observe any "physical indication" of a weapon. *See, e.g.*, *United States v. Post*, 607 F.2d 847, 851 (9th Cir. 1979) ("[D]espite the fact that he had not observed a weapon or any physical indication of a weapon, it was reasonable to assume, from the nature of the offense contemplated [drug trafficking], that [the defendant] was armed and dangerous." (citing *Terry*, 392 U.S. at 28)). Indeed, courts have routinely upheld a right to frisk on the basis that the officer has legitimately stopped a person suspected of a crime, like domestic violence, that is *frequently* committed with the use of weapons. *See, e.g.*, *Terry*, 392 U.S. at 28 (finding it reasonable to assume that men whose behavior suggests they are casing a building for a "daytime robbery" might be armed because of the nature of the crime); *United States v. Mattarolo*, 209 F.3d 1153, 1158 (9th Cir. 2000) (*Terry* frisk of nighttime burglary suspect was constitutional); *People v. Shackelford*, 546 P.2d 964, 966–67 (Colo. App. 1976) (police could lawfully frisk an individual who was found in the immediate vicinity of the area from which a rape victim had fled because the individual "matched the description of a suspect who had allegedly committed an act of violence"—rape).

Like burglary and robbery, domestic violence is frequently committed with a firearm or other weapon. For example, 36.7 percent of female domestic violence shelter residents in California reported having at some point been threatened or harmed with a firearm during a domestic dispute. *See* Susan B. Sorenson, Ph.D., & Douglas J. Wiebe, Ph.D., *Weapons in the Lives of Battered Women*, 94 Am. J. Pub. Health 1413 (2004). Another study by the Department of Justice found that roughly 15 percent of all incidents of domestic violence involve a weapon. *See* Callie Marie Rennison, Ph.D., U.S. Dep't of Justice, Report No. NCJ 187635, Bureau of Justice Statistics Special Report: Intimate Partner Violence and Age of Victim (1993–99) 7 (Oct. 2001). And in 2011, domestic violence assaults involving a firearm accounted for nearly two-thirds of all fatal shootings of female victims. *See* Voilence Pol'y Ctr., When Men Murder Women: An Analysis of 2011 Homicide Data 6 (Sept. 2013).

Indeed, the majority concedes that some domestic violence calls can be "dangerous," even deadly, for all parties involved. Maj. Op. at 22. However, the majority emphasizes that domestic violence encompasses a broad spectrum of "criminal acts of varying degrees of seriousness" to support its holding that the domestic violence nature of a call cannot justify a *Terry* frisk. Maj. Op. at 33. But the majority's argument ignores the practical reality that an officer often does not know *what part* of that spectrum of criminal acts he will confront when he arrives at the scene of a domestic dispute. Indeed, this is what *distinguishes* domestic violence from other "broad categories" of crimes—like theft. Whereas there is little risk that an officer investigating a suspected mail thief will instead encounter an armed bank robber, *cf. United States v. Flatter*, 456 F.3d 1154, 1158 (9th Cir. 2006) (cited by the majority) ("Mail theft by postal employees is not

a crime that is frequently associated with weapons. . . ."), an officer investigating a report of "simple battery" may well find that the domestic violence has escalated to assault with a deadly weapon by the time the police arrive.[4]

The majority also reiterates that Thomas was observed committing only a "simple battery" (referring to the second dispatch). *See, e.g.*, Maj. Op. at 28. But in fact, there were *two* reports of domestic violence, and Thomas matched the description of both reports. The first report did not specify the precise behavior it characterized as "domestic violence"—it could well have involved more severe abuse, including with a weapon.[5] And in any event, even a "simple battery" can quickly escalate into something far more dangerous. Unless an officer has credible evidence that a domestic violence suspect is *not* armed, a reasonably cautious officer would assume that a domestic violence suspect "might" be armed—and that is all that is required here. The

---

[4] Given the demonstrated danger to police officers associated with domestic violence calls, the majority's citation to cases involving non-violent crimes not associated with weapons misses the point. *See* Maj. Op. at 15, 18–19, 37–38 (citing, *e.g.*, *United States v. Flatter*, 456 F.3d 1154, 1158 (9th Cir. 2006); *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1016 (9th Cir. 2009) (suspicion that a person found sleeping in his car was under the influence of drugs did not give rise to a reasonable suspicion that suspect was armed)). As the majority recognizes, *see* Maj. Op. at 22, domestic violence can be very "dangerous[]" and can involve crimes clearly associated with weapons—like assault with a deadly weapon or homicide. Thus domestic violence is of a fundamentally different character than the crimes that we have found do not justify a *Terry* frisk.

[5] Because Thomas matched the description of both reports, and because both reports involved domestic violence occurring on the Escondido campus, Dillard reasonably believed the dispatches were related.

majority's analysis is thus impermissibly infused with the benefit of hindsight.

Further undermining the majority's view is our circuit's repeated observation that "[t]he volatility of situations involving domestic violence" makes them particularly dangerous. *Marquez v. City of Phoenix*, 693 F.3d 1167, 1175 (9th Cir. 2012), *as amended on denial of reh'g* (Oct. 4, 2012) (alteration in original) (quoting *Mattos v. Agarano*, 661 F.3d 433, 450 (9th Cir. 2011)). We have also said that "[w]hen officers respond to a domestic abuse call, they understand that 'violence may be lurking and explode with little warning.'" *United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2004) (quoting *Fletcher v. Clinton*, 196 F.3d 41, 50 (1st Cir. 1999)) ("[M]ore officers are killed or injured on domestic violence calls than on any other type of call." (quoting Hearings before Senate Judiciary Committee, 1994 WL 530624 (F.D.C.H.) (Sept. 13, 1994) (statement on behalf of National Task Force on Domestic Violence))); *see also Hopkins v. Bonvicino*, 573 F.3d 752, 766 (9th Cir. 2009) (stating the same).

Consistent with our precedent, Officer Dillard's training had taught him that "a domestic violence call can be a very dangerous call to a police officer." The undisputed evidence in the record (a declaration by a police procedures expert) indicates that 31.7 percent of assaults on police officers in 2011 occurred "while answering domestic violence type radio calls," and 12.7 percent of the 72 officers killed in 2011 were answering domestic violence calls (citing the Federal Bureau of Investigation's ("FBI's") 2011 annual publication on police assaults and deaths).

My colleagues in the majority are correct that the evidence in the record appears somewhat to overstate the FBI data it purports to summarize, because the figures cited in fact encompass assaults and deaths attributable to *all* kinds of "disturbance calls"—not just domestic violence calls. *See* Maj. Op. at 24 n.11. But the majority ignores that the FBI data nevertheless *supports* our circuit's oft-stated conclusion that domestic violence is frequently associated with weapons and is one of the more dangerous calls an officer can receive. For example, the FBI's 2011 statistics show that approximately 33 percent of the assaults on police officers in 2011 (18,216 out of 54,774 assaults) were committed while police were responding to "disturbance call[s]," a category which includes domestic violence calls. FBI, *Law Enforcement Officers Assaulted: Circumstances at Scene of Incident by Type of Weapon and Percent Distribution*, *2011* (last visited Feb. 17, 2016), https://www.fbi.gov/about-us/cjis/ucr/leoka/2011/tables/table-73 [hereinafter "Table 73"]. And of these 18,216 assaults, 17.3 percent (3,155 assaults annually) were committed with a weapon. *Id.*

Indeed, there is reason to think that domestic violence calls are *more dangerous* to police officers than calls relating to other crimes which we have already deemed to give rise, by their very nature, to a reasonable suspicion that a suspect might be armed. In *United States v. Mattarolo*, 209 F.3d 1153 (9th Cir. 2000), for example, we held that a *Terry* frisk of a nighttime burglary suspect was constitutional, based on the dangerous nature of the crime. *Id.* at 1158. But the FBI's data shows that two of the 72 police officers killed in 2011 were responding to a "domestic disturbance," while *zero* officers were killed in 2011 while responding to a "burglary in progress" or the "pursuing a burglary suspect." *See* FBI, *Law Enforcement Officers Feloniously Killed: Circumstance*

*at Scene of Incident, 2002–2011* (last visited Feb. 17, 2016), available at https://www.fbi.gov/about-us/cjis/ucr/leoka/ 2011/tables/table-19 [hereinafter "Table 19"].  In fact, from 2002 to 2011, more than three times as many police officers were killed while responding to domestic violence calls than while responding to burglary calls.  *Id.* (showing that 36 officers were "feloniously killed" while responding to domestic violence calls, as compared to only 11 officers responding to active burglary calls).  And in 2004, 16 percent (9 out of 57) of the police officers feloniously killed in the line of duty were responding to *domestic* disturbance calls, specifically.  *Id.*

Instead of looking at this hard data or following our own precedent, however, the majority credits a recent article and the findings of one researcher whose study was limited to the Los Angeles area, which suggest that robbery and burglary calls are actually more dangerous than domestic violence calls.  *See* Maj. Op. at 23–24 & n.11.[6]  Even assuming, *arguendo*, that robbery and burglary calls are more frequently associated with weapons than domestic violence calls, *it does not follow* that domestic violence calls do not *also* pose a substantial threat to a police officer's safety.  In holding that a "daylight robbery . . . would be likely to involve the use of weapons," *Terry* made no suggestion that robbery represented

---

[6] For example, the majority credits the opinion of the author of an article appearing in the May 2011 edition of The Police Chief, which (like the majority) editorializes on the FBI's statistics presented herein, but does not actually present any contrary evidence to support its conclusion.  In any event, I find it odd that the majority chooses to credit this article over the well-supported conclusions reached by at least two Ninth Circuit cases.  *See, e.g.*, *Hopkins v. Bonvicino*, 573 F.3d 752 (9th Cir. 2009); *United States v. Martinez*, 406 F.3d 1160 (9th Cir. 2004), discussed *supra*, at 58.

the outer limit of crimes thought to be sufficiently dangerous to support a reasonable inference on the part of the officer that a person suspected of that crime might be armed. *See Terry v. Ohio*, 392 U.S. 1, 28 (1968). Rather, *Terry* recognized that even where an officer does not have the probable cause necessary to make an arrest, it would "be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm," as long as the "officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others." *Id.* at 24.

The FBI data referenced in the record shows that thousands of police officers are assaulted every year while responding to domestic violence disputes. One in every five of these assaults involves a deadly weapon (a firearm, a knife, or another "dangerous weapon"). *See* Table 73. And every year, these assaults result in deaths to law enforcement officers. *See* Table 19. Given these statistics, I would find that domestic violence calls are associated with weapons *frequently enough* that an officer can form a reasonable suspicion that a suspect might be armed based on the domestic violence nature of the call.[7]

---

[7] The warrantless entry cases cited by the majority for the proposition that "domestic abuse cases [do not] create a per se exigent need for warrantless entry," do not resolve whether a *frisk*—which, unlike warrantless entry, is necessitated by *safety* concerns—may be justified by the domestic violence nature of the call. *See* Maj. Op. at 26 (citing *United States v. Black*, 482 F.3d 1035 (9th Cir. 2007), and *United States v. Martinez*, 406 F.3d 1160 (9th Cir. 2005)). Moreover, both cases cited by the majority *upheld* the constitutionality of the officers' warrantless entry in response to a domestic violence call. *See Black*, 482 F.3d at 1040–41;

Of course, an officer's reasonable suspicion could in some circumstances be dispelled by other facts known to the officer. *See Terry*, 392 U.S. at 28 (suggesting that, under certain circumstances, a suspect's response to an officer's approach might dispel reasonable suspicion that suspect is armed). But at the time he encountered Thomas, Dillard was aware of no such facts. Dillard encountered an individual matching the description of a suspect of two reports of domestic abuse, who emerged "suspiciously" from a concealed area where the violence had allegedly occurred with a woman. Thomas was wearing baggy clothes and a long shirt that could conceal weapon. Thomas acted "standoffish." He refused to consent to a weapons search. More importantly, he refused even to raise his hands or to move them away from his waistline, where Dillard was reasonably concerned a weapon might be concealed.[8]

True, Thomas' baggy clothing could not *alone* support a reasonable suspicion that he was armed. *See Ybarra v. Illinois*, 444 U.S. 85, 93 (1979) (government failed to "articulate any specific fact that would have justified" a reasonable suspicion that Ybarra was armed and dangerous

---

*Martinez*, 406 F.3d at 1165. Thus, these cases hardly support the majority's conclusion that Officer Dillard violated Thomas' Fourth Amendment rights in conducting a *Terry* frisk of an individual matching the description of two reports of domestic violence on the Escondido campus.

[8] The mere fact that Thomas provided answers to Officer Dillard's questions (*i.e.* refusals to cooperate) did not "negate" Dillard's "reasonable hypothesis" that he might be armed. *See Terry*, 392 U.S. at 5, 28 (defendant's "mumble" in response to officer's question did not "negate" a reasonable hypothesis that the defendant might be armed where the officer had observed suspicious activity that led him to believe the defendant intended to commit a crime involving weapons).

when "the most" the officer "could point to was that Ybarra was wearing a 3/4-length lumber jacket, clothing which the State admits could have been expected on almost any tavern patron" at that time of year). But where an officer is confronting the suspect of a violent crime frequently committed with weapons, the fact that the suspect's clothing *could* conceal a weapon is relevant to determining whether reasonable suspicion that the suspect might be armed is dispelled.[9]

The majority focuses on the lack of active violence when Officer Dillard arrived. But even if the initial violence has subsided, it is not uncommon for the perpetrator, or even the victim, to erupt into sudden violence or anger at an officer responding to a domestic violence call. *See Martinez*, 406 F.3d at 1164; *cf.* Lininger and Marie De Sanctis, *supra*. If that occurs, the seemingly calm scene can turn dangerous or deadly (if weapons are present) in a matter of seconds. Given this volatility, a reasonably cautious police officer will start by securing the domestic violence scene to ensure there are no weapons on hand if someone does become violent—exactly what Officer Dillard tried to do here. In fact, an officer has a duty as a "community caretak[er]" to take reasonable steps to protect the victim of reported domestic violence, and Officer Dillard's "failure to do so would have amounted to a dereliction of duty." *United States v. Willis*, 431 F.3d 709, 713 (9th Cir. 2005).

Perhaps with the benefit of "20/20 . . . hindsight" we might say that Officer Dillard should have realized that

---

[9] For example, reasonable suspicion that a suspect was armed might be dispelled if the suspect's clothing made clear he would have nowhere to hide a weapon.

Thomas was not armed. But in the Fourth Amendment context we judge the reasonableness of an officer's conduct "from the perspective of a reasonable officer on the scene." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citing *Terry*, 392 U.S. at 20–22 (1968)); *cf. Mattarolo*, 209 F.3d at 1158 ("The officer must choose between being sure that the suspect is not armed and jeopardizing his own safety.").

In my view, the nature of a domestic violence call justifies an officer's formulation of a reasonable suspicion that a suspect may be armed (in the absence of mitigating circumstances). Indeed, a law enforcement officer *should* feel a moral duty to protect victims of domestic violence. And while an officer of course cannot shadow an abuser forever to ensure no future violence befalls the victim, he *can* at least make sure that the "scene is secure" from possible violence with weapons before he leaves the victim with an abuser. Given that domestic violence assaults account for nearly two-thirds of all fatal shootings of female victims in the United States, *see* Violence Pol'y Ctr. Report, *supra*, I would find that the relatively small incursion on bodily dignity of permitting a *Terry* frisk based on the domestic violence nature of a police call is far outweighed by the strong law enforcement interest—indeed, the broader societal interest—in saving the lives of domestic violence victims. We achieve this interest by assuring that abusers are not armed before the police officer leaves the scene of a domestic violence encounter. Yet the majority today requires a law enforcement officer to face potential liability unless he leaves a domestic violence scene without any assurance that the abuser is not armed and will not again inflict violence on the victim—only next time, with a gun. I cannot endorse a legal rule that places law enforcement officers in such a stressful dilemma. Thus, while I agree with the result reached by the

majority today, I cannot join my colleagues to the extent they deny law enforcement officers a tool—the *Terry* frisk—vital for ensuring their own safety, as well as the safety of the domestic violence victims they have a duty to protect.