**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ARMANDO VILLANUEVA, individually and as Successor In Interest to Pedro Villanueva, deceased; HORTENCIA SAINZ, individually and as Successor In Interest to Pedro Villanueva, deceased; FRANCISCO OROZCO, individually, | No. 19-55225<br><br>D.C. No.<br>8:17-cv-01302-JLS-KES |
| *Plaintiffs-Appellees*, | |
| v. | OPINION |
| STATE OF CALIFORNIA, | |
| *Defendant*, | |
| and | |
| JOHN CLEVELAND; RICHARD HENDERSON, | |
| *Defendants-Appellants*. | |

Appeal from the United States District Court
for the Central District of California
Josephine L. Staton, District Judge, Presiding

Submitted May 14, 2020[*]
Pasadena, California

---

[*] The panel unanimously concludes this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

Filed January 28, 2021

Before:  David M. Ebel,[**] Kim McLane Wardlaw, and
John B. Owens, Circuit Judges.

Opinion by Judge Wardlaw

## SUMMARY[***]

### Civil Rights

The panel affirmed the district court's order denying
qualified immunity to police officers in an action brought
pursuant to 42 U.S.C. § 1983 alleging the officers used
excessive force in violation of the Fourth Amendment when
they shot and killed Pedro Villanueva and wounded
Francisco Orozco, a passenger in Villanueva's vehicle.

The panel first addressed whether Orozco—a passenger
who was not intentionally targeted by the Officers—had a
cognizable Fourth Amendment interest.    The panel
concluded that under *Brower v. Cnty. of Inyo*, 489 U.S. 593,
597 (1989), *Brendlin v. California,* 551 U.S. 249, 251
(2007), and *Nelson v. City of Davis*, 685 F.3d 867, 876 (9th
Cir. 2012), because Orozco's freedom of movement was
terminated when the Officers intentionally shot at the vehicle
in which he was a passenger to stop its movement, Orozco

---

[**] The Honorable David M. Ebel, United States Circuit Judge for the
U.S. Court of Appeals for the Tenth Circuit, sitting by designation.

[***] This summary constitutes no part of the opinion of the court.  It
has been prepared by court staff for the convenience of the reader.

was seized within the meaning of the Fourth Amendment. It mattered not whether the Officers intended to shoot Orozco or whether they even knew he was present as a passenger. Under clearly established precedent at the time, Orozco was seized.

The panel held that taking the facts in the light most favorable to the plaintiffs, after Villanueva stopped his truck following a vehicular pursuit, he cautiously performed a three-point-turn, his truck—which was 15 to 20 feet away from the Officers—was not aimed directly at Sergeant Cleveland and was moving very slowly and was not accelerating when the Officers began shooting. In these circumstances, a reasonable jury could conclude that the Officers used excessive force, because they lacked an objectively reasonable basis to fear for their own safety, as they could simply have stepped back or to the side to avoid being injured.

The panel held that because it found at the summary judgment stage that the car was slow-moving and the Officers could have simply moved away to avoid injury, their use of deadly force was clearly established as unreasonable as of 1996 by *Acosta v. City & Cnty. of S. F.*, 83 F.3d 1143, 1146 (9th Cir. 1996). Accordingly, the officers were not entitled to qualified immunity.

## COUNSEL

Donna M. Dean, Deputy Attorney General; Catherine Woodbridge and Joel A. Davis, Supervising Deputy Attorneys General; Danielle F. O'Bannon, Senior Assistant Attorney General; Xavier Becerra, Attorney General of

California; Office of the California Attorney General, Los Angeles, California; for Defendants-Appellants.

Paul R. Kiesel and Bryan Garcia, Kiesel Law, LLP, Beverly Hills, California, for Plaintiffs-Appellees Armando Villanueva and Hortencia Sainz.

Dale K. Galipo and Renee V. Masongsong, Law Offices of Dale K. Galipo, Woodland Hills, California, for Plaintiff-Appellee Francisco Orozco.

## OPINION

WARDLAW, Circuit Judge:

Two police officers appeal the denial of qualified immunity in this § 1983 action alleging excessive force in violation of the Fourth Amendment. We must decide whether these officers' use of deadly force against a slow-moving vehicle following a high-speed chase violated the victims' clearly established constitutional rights at the time of the incident. Because we agree with the district court that the law precluding deadly force under the circumstances the officers confronted was clearly established, we affirm.

## I.

Many of the facts underlying this case are disputed. We recount them in the light most favorable to Orozco and Villanueva, as the non-moving parties in the district court. *Tuuamalemalo v. Greene*, 946 F.3d 471, 474 (9th Cir. 2019) (per curiam).

A.

On July 3, 2016, at 10:35pm, Sergeant Cleveland and Officer Henderson ("the Officers") were on patrol near Fullerton, California looking for illegal street racing and "sideshows," events where streets are blocked off for drivers to perform unlawful maneuvers like burnouts and donuts.[1] The Officers wore plain clothes and drove an unmarked black sedan, but they also wore dark tactical vests with police insignia. The unmarked car was equipped with both a red and blue flashing light and a blue and amber light.

During their patrol, the Officers found an approximately twenty-car sideshow taking place in the Santa Fe Springs Swap Meet parking lot. One of the participating cars was a red Chevrolet Silverado pickup truck occupied by Pedro Villanueva, the driver, and Francisco Orozco, his passenger. After witnessing the Silverado perform or attempt to perform an illegal maneuver,[2] the Officers entered the parking lot, intending to make a traffic stop.

As the Officers drove into the parking lot, Villanueva drove toward the outlet that the Officers had just entered. The Officers then started following the Silverado. According to Orozco, the Officers did not use the regular blue and white light or a typical siren, but only an amber

---

[1] "Donuts" involve quickly rotating the rear of a car around the front wheel in the hope of creating circular skid marks, while "burnouts" involve spinning the wheels on a stationary car to cause the tires to heat up and make smoke.

[2] The exact details of the maneuver are in dispute. Cleveland testified that the Officers saw the Silverado perform multiple "donuts," while Orozco testified that Villanueva "attempted" a "burnout," "but he just more or less screeched the tires."

light and an atypical screeching noise that was not identifiable as a police siren. According to Orozco, Villanueva drove out of the lot at a speed that "didn't feel fast," and without incident.

After leaving the lot, Villanueva drove away. The Officers turned off the sirens and lights and followed. Orozco and Villanueva were "scared," and "in fear for [their] lives," because they thought it was "very odd" that a dark car was following them, as they had received warnings on social media and from an acquaintance to be wary of muggers in suspicious black sedans at the truck clubs or truck award shows. Villanueva continued driving away, going between 50 and 70 miles per hour on surface streets and running at least three red lights. The Officers followed at a (disputed) distance, intermittently using their sirens when moving through intersections. After several minutes of driving, Villanueva turned north onto North Pritchard avenue, which dead-ends, and then right onto MacArthur Avenue, which also dead-ends. The Officers continued their pursuit, turning onto North Pritchard and then approaching the intersection with MacArthur, where they saw the Silverado stopped on MacArthur.

All parties agree on the barebones of what happened next. The Officers immediately exited their vehicle and drew their firearms. Cleveland stood near the open driver's side door of the police car and Henderson stood near the open passenger's door. At the same time, Villanueva attempted to reverse out of MacArthur in a three-point turn that resulted in the rear of his vehicle pointing toward the Pritchard dead-end and the front generally facing the Officers, who were approximately 15 to 20 feet away. The Officers then opened fire on the vehicle and shouted a warning of some kind at the same time or within a second of

firing. The shots killed Villanueva and injured Orozco. The Silverado then slowly rolled forward, ultimately colliding with the Officers' car at a very low speed.

A photo of the intersection, taken after the shooting, is reproduced below. The street that runs horizontally in the photo is Pritchard, and the street that runs vertically is MacArthur.



Viewed in the light most favorable to the plaintiffs, Villanueva performed the three-point turn in a controlled manner, and when the Officers opened fire, the Silverado was moving very slowly and was not pointed directly at either officer or accelerating. After the shooting, Orozco was detained in the truck until a supervisor arrived, at which point he was handcuffed and taken to the hospital.

## B.

Orozco and Villanueva's parents, on behalf of their son, filed this suit, alleging both constitutional and state law

claims, including excessive force in violation of the Fourth Amendment and unreasonable detention and false arrest.[3] The Officers moved for summary judgment, arguing that they were entitled to qualified immunity on some claims, including the excessive force claims, and that others failed as a matter of law. The district court denied the Officers' motion for summary judgment based on qualified immunity for the excessive force claims. First, it found that Orozco had Fourth Amendment standing as a passenger to bring claims against the Officers, relying on *Brendlin v. California*, 551 U.S. 249, 251 (2007). Second, it held that "there are simply too many disputes of material fact to rule on summary judgment that [the Officers]'s use of deadly force was objectively reasonable," and that, construing the facts in the light most favorable to the plaintiffs, a reasonable jury could find that the Officers used excessive force in violation of clearly established law. The district court also denied the Officers' motion for summary judgment as to Orozco's unreasonable detention and false arrest claims on the merits. It declined to address qualified immunity as to those claims, because it found the Officers had not properly asserted the defense. The Officers timely appealed.[4]

---

[3] Villanueva's parents withdrew their unreasonable detention and false arrest claims prior to the district court's denial of summary judgment.

[4] The Officers waived a defense of qualified immunity as to Orozco's unreasonable detention and false arrest claims by failing to assert it in the district court. We have "a 'general rule' against entertaining arguments on appeal that were not presented or developed before the district court." *In re Mercury Interactive Corp. Secs. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010) (citation omitted). "Although no bright line rule exists to determine whether a matter [h]as been properly raised below, an issue will generally be deemed waived on appeal if the

## II.

"[W]e normally have no jurisdiction to hear interlocutory appeals from the denial of summary judgment." *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 944 (9th Cir. 2017). However, under the collateral order doctrine we have jurisdiction over the interlocutory appeal of a denial of qualified immunity, "to the extent that it turns on an issue of law." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). Thus, although "[a]ny decision by the district court 'that the parties' evidence presents genuine issues of material fact is categorically unreviewable on interlocutory appeal,'" *George v. Morris*, 736 F.3d 829, 834 (9th Cir. 2013) (quoting *Eng v. Cooley*, 552 F.3d 1062, 1067 (9th Cir. 2009)), we may exercise jurisdiction by "construing the facts and drawing all inferences in favor of Plaintiffs, to decide whether the evidence demonstrates a violation by [the Officers], and whether such violation was in contravention

---

argument was not raised sufficiently for the trial court to rule on it." *Id.* (internal quotation marks and citation omitted). Failure to argue a point in a motion for summary judgment qualifies as failing to raise that issue below. *See Padgett v. Wright*, 587 F.3d 983, 985 n.2 (9th Cir. 2009) (per curiam) (not reaching an issue not argued in a "memorandum of points and authorities supporting [the] motion for summary judgment before the district court").

"Such waiver is a discretionary, not jurisdictional, determination." *Mercury Interactive Corp.*, 618 F.3d at 992. "We may consider issues not presented to the district court," but "we are not required to do so." *Id.* As the Officers do not offer any arguments as to why we should disregard their waiver, and we do not believe this is one of the "'exceptional' case[s] in which review is necessary to prevent a miscarriage of justice or to preserve the integrity of the judicial process," *id.* (quoting *Bolker v. Comm'r*, 760 F.2d 1039, 1042 (9th Cir.1985)), we decline to reach the Officers' waived qualified immunity argument.

of federal law that was clearly established at the time," *Pauluk v. Savage*, 836 F.3d 1117, 1121 (9th Cir. 2016). "We review the district court's conclusions regarding qualified immunity *de novo*." *Isayeva*, 872 F.3d at 946.

## III.

"[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (citation omitted). A law is clearly established if "at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Id.* (internal quotation marks and citation omitted). "[C]ourts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *Id.* at 590 (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). "While there does not have to be 'a case directly on point,' existing precedent must place the lawfulness of the [conduct] 'beyond debate.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

## A.

Before addressing whether the Officers used excessive force when they shot at Villanueva and the Silverado, we must determine whether Orozco—a passenger who was not intentionally targeted by the Officers—has a cognizable Fourth Amendment interest. The Officers argue that they are entitled to qualified immunity as to Orozco's Fourth Amendment excessive force claim because it is not clearly established "that a passenger struck by a bullet intended to

stop the driver of a vehicle can assert a Fourth Amendment claim." We reject this argument. At the time of the incident, it was clearly established that when the Officers shot at the Silverado, both Villanueva, the driver, and Orozco, the passenger, were seized within the meaning of the Fourth Amendment.[5]

A person is seized under the Fourth Amendment "when there is a governmental termination of freedom of [his] movement through means intentionally applied." *Brower v. Cnty. of Inyo*, 489 U.S. 593, 597 (1989) (emphasis omitted). Freedom of movement is terminated when, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (principal opinion). Recognizing that "[t]he law is settled that in Fourth Amendment terms a traffic stop entails a seizure of the driver," in 2007 the Supreme Court held in

---

[5] The district court framed this inquiry as one about whether Orozco had "standing under the Fourth Amendment to challenge the force exercised against him," and concluded that he did have "standing." It then performed the distinct excessive force analysis without first assessing whether Orozco's "standing" was clearly established. However, it should have addressed the second step of the qualified immunity inquiry. The term Fourth Amendment standing is "a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest" to bring a Fourth Amendment claim, "but it should not be confused with Article III standing, which is jurisdictional." *Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018). Fourth Amendment standing is "not distinct from the merits" of a Fourth Amendment claim and "is subsumed under substantive Fourth Amendment doctrine." *Id.* (internal quotation marks and citation omitted). Thus, even if an individual does have a cognizable Fourth Amendment right, that right must have been "'clearly established' at the time of defendant's alleged misconduct" to overcome qualified immunity. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citation omitted).

*Brendlin* that when a traffic stop occurs the passenger is also seized, because "during a traffic stop an officer seizes everyone in the vehicle, not just the driver." 551 U.S. at 255; *see also Tennessee v. Garner*, 471 U.S. 1, 7 (1985) ("[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment.").

The Officers do not dispute that they made a traffic stop when they shot at Villanueva and the Silverado. Instead, they argue that Orozco was not seized during the stop because seizure requires an intentional act on the part of the officer, *see Brower*, 489 U.S. at 597, and they subjectively intended to shoot only Villanueva. But the Supreme Court "ha[s] repeatedly rejected attempts to introduce this kind of subjectivity into Fourth Amendment analysis." *Brendlin*, 551 U.S. at 260 (collecting cases).[6] As the *Brendlin* Court reasoned, the *Mendenhall* test for what constitutes a seizure is an objective one. It does not ask whether the officers intended a seizure; it instead asks "what a reasonable passenger would understand." *Id.* "The intent that counts under the Fourth Amendment" is the intent conveyed, not the officers' subjective intent. *Id.* at 260–61. So long as the detention is made "through means intentionally applied," it is a Fourth Amendment seizure of the person detained. *Id.* at 254.

The *Brendlin* Court cited *Brower* and *County of Sacramento v. Lewis*, 523 U.S. 833 (1998), to illustrate that

---

[6] The only contrary authority the Officers rely upon are two unpublished memoranda dispositions, *Nakagawa v. Cnty. of Maui*, 686 F. App'x 388, 389 (9th Cir. 2017), and *Arruda ex rel. Arruda v. Cnty. of L.A.*, 373 F. App'x 798, 799 (9th Cir. 2010), and dicta in a pre-*Brendlin* opinion, *United States v. Lockett*, 919 F.2d 585, 590 n.4 (9th Cir. 1990), none of which is binding here.

a passenger can be seized in violation of the Fourth Amendment even if he is not the motivating target, where there is an intentional act employed.  In *Brower*, the Court concluded that officers seized a driver when they purposefully set up a roadblock that the driver then slammed into, because roadblocks are "designed to produce a stop by physical impact if voluntary compliance does not occur." 489 U.S. at 598.  The Court acknowledged that the officers may have "preferred, and indeed earnestly hoped" that the driver would choose to stop before running into the roadblock, but "d[id] not think it practicable to conduct such an inquiry into subjective intent."  *Id.*  The *Brendlin* Court explained that the "officers detained [the *Brower* driver] 'through means intentionally applied'; if the car had had another occupant, it would have made sense to hold that he too had been seized when the car collided with the roadblock."  551 U.S. at 261.

By contrast, in *Lewis*, "an officer *accidentally* ran over a passenger who had fallen off a motorcycle during a high-speed chase."  *Id.* (citing *Lewis*, 523 U.S. at 844) (emphasis added).  "[I]n holding that no seizure took place," the Court "stressed that the officer stopped Lewis's movement by accidentally crashing into him, not 'through means intentionally applied.'"  *Id.*  (quoting *Lewis*, 523 U.S. at 844).  Conversely, if the officer had intentionally collided with the motorcycle to stop it, the injured passenger would also have been seized; as the *Brendlin* Court noted, "[w]e did not even consider, let alone emphasize, the possibility that the officer had meant to detain the driver only and not the passenger" in *Lewis*.  *Id.*

Here, the Officers shot at Villanueva and the Silverado with the intent of stopping the Silverado from moving, effecting a traffic stop by force and seizing Orozco in the

process, just as the *Brower* roadblock would have constituted a seizure of the driver, as well as of any passengers in the car. *See id.* Thus, Orozco was seized under clearly established law as soon as the Officers intentionally fired at the Silverado to effect the stop.

The Officers also dispute that they knew Orozco was in the Silverado. But under *Brendlin*'s logic, it is irrelevant whether they knew any passengers were in the car, because they stopped the car and all its possible occupants when they shot at it. Here, Orozco was subject to the Officers' "intentional action to stop the car"—and with it the "objectively manifested" restraint on his movement— whether the Officers knew he was a passenger when they fired or not. *Id*. at 260. The Third Circuit agrees that *Brendlin* "ma[kes] clear that an officer's knowledge of a passenger's presence in the vehicle is not dispositive" to the question of seizure "so long as the detention is willful and not merely the consequence of an unknowing act." *Davenport v. Borough of Homestead*, 870 F.3d 273, 279 (3d Cir. 2017) (internal quotation marks and citation omitted).

Indeed, all of the other circuits that have addressed whether a passenger struck by a stray bullet aimed at the vehicle or driver has a cognizable Fourth Amendment claim agree with our conclusion that such a passenger does have a Fourth Amendment claim in these circumstances. The Third, Sixth, and Eleventh Circuits have all concluded that by intentionally stopping a vehicle, an officer subjects the vehicle's passenger to a Fourth Amendment seizure. *See Davenport*, 870 F.3d at 279 ("[A] passenger shot by an officer during the course of a vehicular pursuit may seek relief under the Fourth Amendment."); *Vaughan v. Cox*, 343 F.3d 1323, 1328 (11th Cir. 2003) ("[B]ecause he did not intend to shoot [the passenger], [the officer] contends that

[the passenger] did not suffer a Fourth Amendment seizure. We disagree."); *Fisher v. City of Memphis*, 234 F.3d 312, 318–19 (6th Cir. 2000) ("By shooting at the driver of the moving car, [the officer] intended to stop the car, effectively seizing everyone inside, including the Plaintiff."); *see also Lytle v. Bexar Ctny., Tex.*, 560 F.3d 404, 410 (5th Cir. 2009) (no dispute that the passenger was "'seized' within the meaning of the Fourth Amendment"). No other Circuit has addressed the question.

The Officers cite cases from the First, Second, and Tenth Circuits, arguing for a contrary result, but those cases were all pre-*Brendlin*, and address the very different situation where the passenger was also a hostage and the officers were trying to rescue the passenger, not arrest him. *See Childress v. City of Arapaho*, 210 F.3d 1154, 1157 (10th Cir. 2000) ("The police officers in the instant case did not 'seize' plaintiffs within the meaning of the Fourth Amendment but rather made every effort to deliver them from unlawful abduction."); *Medeiros v. O'Connell*, 150 F.3d 164, 168 (2d Cir. 1998) ("[F]ar from seeking to restrain [the injured hostage's] freedom, the troopers' every effort was bent on delivering all the hostages from deadly peril."); *Landol-Rivera v. Cruz Cosme*, 906 F.2d 791, 795 (1st Cir. 1990) ("A police officer's deliberate decision to shoot at a car containing a robber and a hostage *for the purpose of stopping the robber's flight* does not result in the sort of willful detention of the hostage that the Fourth Amendment was designed to govern.").[7]

---

[7] The officers mistakenly assert that a recent Tenth Circuit case, *Carabajal v. City of Cheyenne*, *Wyoming*, 847 F.3d 1203 (10th Cir. 2017), "suggest[s] that the Fourth Amendment does not apply to a passenger's claim." In *Carabajal*, however, the Tenth Circuit explicitly

Moreover, as of the time of the events here, we had already applied *Brendlin* and *Brower* to hold that a Fourth Amendment seizure occurred where the officers intentionally used force that injured an individual in a crowd. *Nelson v. City of Davis*, 685 F.3d 867, 876 (9th Cir. 2012). There, we concluded that Nelson was "unquestionably seized under the Fourth Amendment," *id.* at 876, by officers who intentionally shot pepperballs into a large college party they wished to disperse, even though the officers did not specifically intend to target Nelson, who was hit in the eye with one of the projectiles, *id.* at 876–78.

As here, we rejected the officers' argument that because Nelson was not individually the target of their use of force, his injury was unintentional and thus not in violation of the Fourth Amendment. *Id.* at 876. Applying *Brower* and *Brendlin*, we explained that "[t]his argument misapprehends the distinction between intentional and unintentional conduct that the Supreme Court has repeatedly held as determinative of the Fourth Amendment analysis." *Id.* As we elaborated:

> [a]lthough the officers may have intended that the projectiles explode over the students' heads or against a wall, the officers' conduct resulted in Nelson being hit by a projectile

---

declined to reach the question of whether a seizure of the passenger occurred when the officers shot directly into the vehicle. *Id.* at 1212–13. The Tenth Circuit thought that the First Circuit's discussion in *Landol-Rivera* showed a circuit split on seizures of passengers but failed to note that *Landol* involved a hostage situation and was decided prior to *Brendlin*, so there was in fact no split. *Id.* at 1212. However, because it believed there was such division, it simply reasoned that the law was not clearly established and ruled for the officers on the basis of qualified immunity. *Id.* at 1213.

> that they intentionally fired towards a group of which he was a member. Their conduct was intentional, it was aimed towards Nelson and his group, and it resulted in the application of physical force to Nelson's person as well as the termination of his movement. Nelson was therefore intentionally seized under the Fourth Amendment.

*Id.* at 877. We further held that as of the time of Nelson's shooting, it was clearly established "that the intentional application of force which terminates an individual's freedom of movement results in a seizure." *Id.* at 884 (citing *California v. Hodari D.*, 499 U.S. 621 (1991); *Brower*, 489 U.S. 593).

We therefore conclude that under *Brower*, *Brendlin*, and *Nelson*, because Orozco's freedom of movement was terminated when the Officers intentionally shot at the Silverado in which he was a passenger to stop its movement, Orozco was seized within the meaning of the Fourth Amendment. It matters not whether the Officers intended to shoot Orozco or whether they even knew he was present as a passenger. Under clearly established precedent at the time, Orozco was seized.

### B.

It is clear that Orozco was seized along with Villanueva. We now turn to whether the two were unreasonably seized; that is, whether they have a claim of excessive force under clearly established law such that the Officers are not entitled to qualified immunity.

1.

Allegations of excessive force during an investigatory stop or arrest of a free citizen are examined under the Fourth Amendment's prohibition against unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394 (1989); *see also Garner*, 471 U.S. at 7.  This is an objective inquiry that asks whether an officer's actions were reasonable in light of the circumstances he confronted.  *Graham*, 490 U.S. at 397. Determining whether a particular use of force was reasonable "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Id.* at 396 (internal quotation marks and citation omitted).  To assess the government interests, we evaluate a "range of factors" that include "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others (3) whether he was actively resisting arrest or attempting to evade arrest by flight, and any other exigent circumstances that existed at the time of the arrest."  *Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001) (cleaned up and citation omitted); *see also Graham*, 490 U.S. at 396. In cases involving use of deadly force against a fleeing suspect, "the Supreme Court has crafted a more definitive rule," allowing an officer to use deadly force "only if 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'"  *Orn v. City of Tacoma*, 949 F.3d 1167, 1174 (9th Cir. 2020) (quoting *Garner*, 471 U.S. at 11).  A suspect may pose a threat of serious physical harm "if 'there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm,' or if the suspect threatens the officer or others with a weapon

capable of inflicting such harm." *Id.* (quoting *Garner*, 471 U.S. at 11).

The Officers argue that their use of deadly force did not violate the Fourth Amendment as a matter of law because Villanueva threatened them with a deadly weapon—his truck—and any reasonable officer in their positions would have believed that Villanueva posed an immediate threat of serious harm or death to Sergeant Cleveland.[8]  But in this case, the key facts demarcating the line between reasonable and unreasonable force are in dispute.  Because we must construe these facts and the reasonable inferences that arise from them in favor of the plaintiffs, *Thomas v. Dillard*, 818 F.3d 864, 874 (9th Cir. 2016), we cannot agree that the Officers' actions were reasonable as a matter of law.

"A moving vehicle can of course pose a threat of serious physical harm, but only if someone is at risk of being struck by it." *Orn*, 949 F.3d at 1174.  Use of deadly force to stop a recklessly speeding vehicle during a car chase is therefore ordinarily reasonable under the Fourth Amendment.  *See, e.g.*, *Mullenix v. Luna*, 577 U.S. 7, 15 (2015) ("The Court has thus never found the use of deadly force in connection with a dangerous car chase to violate the Fourth Amendment."); *Scott v. Harris*, 550 U.S. 372, 386 (2007)

---

[8] The Officers' argument rests entirely on the reasonableness of their fear that Villanueva's truck was about to hit Sergeant Cleveland.  They do not argue that they had probable cause to believe that Villanueva committed a crime involving the infliction or threatened infliction of serious physical harm, and acknowledge that the only crimes they observed him commit were mere traffic violations.  Nor do they argue that they were concerned for the safety of others.  They had no reason to believe anyone in the Silverado was in possession of a firearm, and no evidence indicates that any persons other than the Officers were directly in or near the path of the car when they fired.

("A police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment.").

But this case does not involve a shooting during a high-speed chase.  It is undisputed that Villanueva slowed to below the speed limit on Pritchard and came to a stop on MacArthur before performing the three-point turn.  Even under the Officers' view of the facts, "the truck was moving forward at a speed of up to five miles an hour" when they shot at it.

We have consistently found use of deadly force to stop a slow-moving vehicle unreasonable when the officers could have easily stepped out of the vehicle's path to avoid danger. *See Orn*, 949 F.3d at 1175 ("Orn's vehicle was moving at just five miles per hour.  [The officer] could therefore have avoided any risk of being struck by simply taking a step back."); *Acosta v. City & Cnty. of S. F.*, 83 F.3d 1143, 1146 (9th Cir. 1996), *as amended* (June 18, 1996), *abrogated on other grounds by Saucier v. Katz*, 533 U.S. 194 (2001) (finding that a reasonable officer "would have recognized that he could avoid being injured when the car moved slowly, by simply stepping to the side").  In contrast, we have found use of deadly force against a stopped or slow-moving vehicle reasonable only when the driver was trying to evade arrest in an aggressive manner involving attempted or actual acceleration of the vehicle. *See Monzon v. City of Murrieta*, 978 F.3d 1150, 1161 (9th Cir. 2020) (finding use of deadly force reasonable when "the van's event data recorder, or 'black box,' shows that the van's acceleration pedal was *repeatedly* pressed down between 80 and 99 percent during the very short 4.5 seconds from start to impact, and the van reached a speed of over 17 mph before hitting [the officer]'s cruiser"); *Wilkinson v. Torres*, 610

F.3d 546, 551–53 (9th Cir. 2010) (finding deadly force reasonable where the officer "was standing in a slippery yard with a minivan accelerating around him"); *see also Plumhoff*, 572 U.S. at 776 (finding deadly force reasonable where "the front bumper of [the driver's] car was flush with that of one of the police cruisers, [the driver] was obviously pushing down on the accelerator because the car's wheels were spinning, and then [the driver] threw the car into reverse 'in an attempt to escape.'").

The key question, then, is whether Villanueva accelerated or attempted to accelerate toward the Officers before the Officers shot at the Silverado and its occupants. *See Monzon*, 978 F.3d at 1163; *Wilkinson*, 610 F.3d at 551–53. The Officers claim Villanueva was driving "recklessly" during the three-point turn, to the point that he hit a car behind him, and that he faced their direction and hit the gas before shots were fired. But witness testimony suggests that Villanueva's three-point turn was controlled, that he did not crash into another car, and that he never accelerated toward the police vehicle or the Officers. Orozco attested that Villanueva was driving below the speed limit while making the turn, and that Orozco did not feel the Silverado collide with another vehicle behind it. He also attested that the Silverado was not moving directly toward the police vehicle at the time of the shooting, and that he did not see either officer "in the path of the truck" at any point before or during the shooting. Witness Lino Mendez testified that he did not hear the Silverado collide with another vehicle, the engine rev, or the tires screech, and that he was very confident that the Silverado did not accelerate toward the police vehicle. Witness Abel Orozco (no relation) testified that the turn "wasn't fast" and that he "didn't hear no revving or no burning tires or anything like that." Witness Thomas Hinkle, Jr., testified that the Silverado tried to make a U-turn at a

"very slow" speed and was not rushing.  He never heard the engine rev and did not see the Silverado accelerate forward toward the police sedan.

Taking the facts in the light most favorable to the plaintiffs, then, the three-point-turn was performed cautiously, the truck—which was 15 to 20 feet away from the Officers—was not aimed directly at Sergeant Cleveland and was moving very slowly and not accelerating when the Officers began shooting.    In these circumstances, a reasonable jury could conclude that the Officers used excessive force, because they "lacked an objectively reasonable basis to fear for [their] own safety, as [they] could simply have stepped back [or to the side] to avoid being injured."  *Orn*, 949 F.3d at 1179; *see also Acosta*, 83 F.3d at 1146.

2.

Because excessive use of force is a highly fact-specific inquiry, even when we determine excessive force was used, "police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue."  *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (citation omitted).  Leading cases, such as *Graham* and *Garner*, "are cast at a high level of generality" and provide clearly established law only for the most "obvious" cases. *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam). However, "[p]recedent involving similar facts can help move a case beyond the otherwise 'hazy border between excessive and acceptable force' and thereby provide an officer notice that a specific use of force is unlawful." *Kisela*, 138 S. Ct. at 1153 (quoting *Mullenix*, 577 U.S. at 18). Because at the summary judgment stage we find that the car was slow-moving and the Officers could have simply moved away to avoid injury, their use of deadly force was clearly

established as unreasonable as of 1996 by *Acosta*, 83 F.3d at 1145–47.

In *Acosta*, an off-duty, plainclothes police officer chased on foot two men he believed had stolen a purse. *Id.* at 1144. The men got into a waiting, stopped car driven by Michael Acosta. *Id.* The officer, still in pursuit, positioned himself near the front of the car, standing closer to the side than dead-center. *Id.* at 1146. The vehicle then began "moving or rolling very slowly from a standstill" toward the officer. *Id.* at 1147. The officer fired two shots into the car, killing Acosta. *Id.* at 1144. We held that the officer violated the Fourth Amendment and was not entitled to qualified immunity because "a reasonable officer could not have reasonably believed that shooting at the driver of the slowly moving car was lawful," *id.* at 1148, as he "would have recognized that he could avoid being injured when the car moved slowly[] by simply stepping to the side," *id.* at 1146.

*Acosta* thus clearly established that an officer who shoots at a slow-moving car when he can easily step out of the way violates the Fourth Amendment, as we recently reaffirmed in *Orn.* 949 F.3d 1167. In *Orn*, after refusing to stop for a police car with lights activated, a driver led officers on a slow-speed pursuit for 15 minutes. *Id.* at 1171–72. The officers eventually cornered the driver inside a parking lot. *Id.* at 1172. After a brief stop, the driver drove slowly—around five miles per hour—through a narrow gap between a police car and another parked car. *Id.* at 1173. While maneuvering between the vehicles, the driver clipped one of the police SUVs. *Id.* At that point, an officer ran toward the driver's vehicle on the passenger side and began firing. *Id.* We held that the officer was not entitled to qualified immunity because the facts of *Orn*, when taken in the light most favorable to the plaintiff, were "not fairly

distinguishable from those in *Acosta*." *Id.* at 1179. "If [the driver] was traveling at only five miles per hour as he maneuvered past [the officer's] SUV, and if he did not accelerate until after being shot, a reasonable jury could conclude that [the officer] lacked an objectively reasonable basis to fear for his own safety, as he could simply have stepped back to avoid being injured." *Id.*

The facts here, when taken in the light most favorable to the plaintiffs, are similarly "not fairly distinguishable from those in *Acosta*." *Id.* As in *Acosta*, Villanueva's vehicle was at a stop shortly before the shooting. In both cases, no officer was standing directly in front of the vehicle. Villanueva, like the driver in *Acosta*, did not accelerate toward the police car or the Officers before the Officers opened fire.**[9]** In light of *Acosta*, all reasonable officers would know it is impermissible to shoot at a slow-moving car when he could "simply step[] to the side" to avoid danger. *Acosta*, 83 F.3d at 1146.

The Officers cite *Wilkinson* for the proposition that we have granted qualified immunity when an officer on foot shot at the driver of a slow-moving vehicle. 610 F.3d at 552. However, as the district court astutely observed, *Wilkinson* involved distinct facts and does not undermine the clarity of *Acosta*'s holding or its application to this case. In *Wilkinson*, a fleeing minivan temporarily came to a stop in a muddy yard after crashing into a telephone pole. *Id.* at 549. Although the minivan was surrounded by police vehicles as well as

---

**[9]** The Officers attempt to distinguish *Acosta* by suggesting "Villanueva 'hit the gas' and the truck was moving forward at a speed of up to five miles per hour" before they shot. But, as already discussed, the factual claim that Villanueva hit the gas or otherwise accelerated is disputed and cannot be used to support qualified immunity at this stage.

two officers on foot, the driver continued to attempt to accelerate, as evidenced by the minivan's wheels "spinning and throwing up mud." *Id.* One officer approached the vehicle and then fell on the slippery ground. *Id.* A second officer, believing the first officer had been run over, then fired at the driver. *Id.* We held that the officer's use of deadly force was reasonable. *Id.* at 553. We emphasized that the minivan was only moving at a slow speed because it was stuck in mud; the driver was "revving" the engine and the van "could have gained traction at any time, resulting in a sudden acceleration in speed." *Id.* at 552. Furthermore, the muddy yard was slippery, and the officer who shot the driver had good reason to believe that another officer was either still on the ground or "standing but disoriented"—that is to say, not able to easily move out of the way of an oncoming car no matter its speed. *Id.* at 551. The chaotic situation in *Wilkinson* has little relevance to the facts of either *Acosta* or this case, which involve non-accelerating vehicles and officers who were standing on normal, paved roads.

As in *Orn*, what the Officers here "most forcefully contest[] is whether [their] alternative account of the shooting should be accepted as true." 949 F.3d at 1181. But we review only "whether, after construing disputed facts and reasonable inferences in favor of [the plaintiff], [the defendant] is entitled to qualified immunity as a matter of law." *Thomas*, 818 F.3d at 874. *Orn* holds that *Acosta* clearly established that an officer violates a person's constitutional rights by shooting at a slow-moving vehicle that the officer could reasonably have side-stepped to remove himself from danger.

## IV.

Viewing the facts in the light most favorable to the plaintiffs, we conclude that the Officers are not entitled to qualified immunity on Villanueva and Orozco's excessive force claims. We therefore **AFFIRM** the district court's denial of summary judgment as to the excessive force claim, **DISMISS** the appeals as to the false detention and arrest claims, and **REMAND** this case for further proceedings.